*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 04-CF-253, 10-CO-386, 04-CF-483, 10-CO-385, 11-CF-1130, 11-CF-1131
04-CF-287, 10-CO-396, 04-CF-297, & 10-CO-395

HARRELL E. HAGANS,

BRION X. ARRINGTON,

WARREN N. ALLEN,

AND

GARY A. LEAKS,

APPELLANTS,

V.

UNITED STATES,

APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(F-5226-00, F-5199-00, F-6780-00 & F-6595-00)

(Hon. Robert I. Richter, Trial Judge)

(Argued June 13, 2012                    Decided June 5, 2014)

*Veronice A. Holt* for appellant Harrell E. Hagans.

*Lisa H. Schertler*, with whom *David Schertler* was on the brief, for appellant Brion X. Arrington.

*Matthew D. Krueger*, with whom *Jeffrey T. Green and Matthew J. Warren,* were on the brief, for appellant Warren N. Allen.

*Matthew M. Hoffman*, with whom *Barbara E. Rutkowski* and *Nicholas J. Kim* were on the brief, for appellant Gary A. Leaks.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Roy W. McLeese III*, Assistant United States Attorney at the time the brief was filed, and *Michael D. Brittin* and *Seth P. Waxman*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and REID, *Senior Judge*.

GLICKMAN, *Associate Judge*: On April 25, 2001, appellants Harrell Hagans, Brion Arrington, Warren Allen, and Gary Leaks were indicted for conspiring to assault and kill members, associates, and friends of a criminal enterprise known as the "Mahdi Brothers organization," and for committing first-degree murder while armed and related crimes in furtherance of that conspiracy. All four appellants were charged with the May 17, 2000, murder of Eva Hernandez. Appellants Arrington and Hagans were charged in addition with the February 29, 2000, murder of Danny Webb.

While appellants were awaiting trial, several other indictments were returned against Arrington. Two of them charged him with assault with intent to kill while armed ("AWIKWA") and related weapons offenses in connection with the shootings of Antonio Tabron on January 24, 1999, and Robert Nelson on January

30, 2000. On the government's motion, these two AWIKWA indictments against Arrington were joined for trial with appellants' earlier indictment. Appellants' joint trial commenced on September 23, 2003, and continued for ten weeks. On December 3, 2003, the jury rendered its verdict, finding appellants guilty on all counts as charged.

The trial court proceedings in this case were lengthy and complex, and appellants challenge their convictions on numerous grounds. We find that some of their claims are not without merit. Indeed, the government now concedes one error of constitutional magnitude, involving its introduction of testimonial hearsay in violation of appellants' Sixth Amendment rights of confrontation. Nonetheless, we conclude that the errors were few in number and not consequential enough to warrant reversal of appellants' convictions.

## I. The Evidence at Trial

According to the government's evidence at trial, appellants were members of the so-called Delafield gang, a group of men who, among other things, sold marijuana in the area around Delafield Place in Northwest Washington, D.C. A number of witnesses testified about the Delafield gang and its activities. Five former members of the gang, cooperating with the prosecution in accordance with

plea agreements, were among the key witnesses against appellants. In 1999 and 2000, the period encompassed by the indictments, appellants Arrington and Hagans, along with cooperating witness Kevin Evans, were the putative leaders of the Delafield gang, while appellants Allen and Leaks and cooperating witnesses Charles Payne, Marquet McCoy, Sean Gardner, and Jason Smith were lower-ranking members. Gardner stored and maintained many of the gang's assault weapons and other firearms, while Jason Smith specialized in stealing cars for gang members' temporary use.

The shootings at issue in this case were allegedly committed in the course of a violent feud between the Delafield gang and a rival drug gang led by five brothers—Abdur, Nadir, Rahammad, Malik, and Musa Mahdi—who lived in the 1300 block of Randolph Street in Northwest Washington, D.C. A number of former members and associates of the Mahdi brothers' organization testified about the shootings pursuant to cooperation plea agreements. (None of the Mahdi brothers themselves appeared as a witness at appellants' trial. However, as we shall discuss, the jury heard redacted versions of factual proffers to which four of the brothers had assented when they pleaded guilty to federal charges.) It was unclear how the feud began—it may have started with the shooting some time prior to 1996 of a Delafield gang member named Steve St. John—but it began to

escalate in 1999 with the shooting of a Mahdi gang member named Antonio Tabron.

**A. The Shooting of Antonio Tabron on January 24, 1999, and its Aftermath**

The principal testimony about this shooting was provided by Delafield cooperator Kevin Evans. On the evening of January 24, 1999, according to Evans, Arrington informed him that Antonio Tabron was parked in front of Arrington's house near an alley in the 300 block of Decatur Street. The two men proceeded to the alley, where they encountered Steve St. John, whom Tabron supposedly had shot in 1996. Arrington handed his 9-millimeter Ruger handgun to St. John so he could retaliate. Shaking, St. John said he could not do it. Arrington took back his gun, fired a number of shots at Tabron's car, and continued to shoot as he backed into the alley and disappeared from Evans's sight. Tabron's car swerved onto the sidewalk and stopped in a front yard on Decatur Street. Police called to the scene found Tabron, who was wounded in the leg, hiding behind a house there.

As various witnesses, including cooperating Mahdi and Delafield gang members, testified, the shooting of Tabron initiated a series of retaliatory actions. On the night following the shooting, Tabron's brother Antoine drove to the Delafield neighborhood with Musa and Nadir Mahdi and others. They shot at a

group of men near the corner of Delafield Place and Fourth Street but did not hit anyone. Evans testified that he witnessed this shooting from his apartment window with Arrington and Hagans. According to Evans, Arrington identified the shooters as Mahdi gang members and said the Delafield gang needed "to get some guns and put a stop[] to it."

A month later, on February 28, 1999, masked gunmen attacked and shot Delafield gang member William Ray on the street shortly after he left a meeting with Arrington, Hagans, Evans, and Charles Payne to go sell marijuana.[1] The shooting left Ray paralyzed. The Delafield gang attributed the shooting to the Mahdis; Ray told Evans he believed it was in retaliation for the shooting of Tabron. A few days after that, in early March, Antoine Tabron and Nadir Mahdi attempted to shoot Payne after following him home from a nightclub.[2] Payne escaped without injury because their guns jammed. Sometime after this, according to Payne and Evans, another Mahdi gang member shot at them while they were in Evans's car.

---

[1] Payne and Evans witnessed the shooting and testified about it at trial.

[2] Payne and Tabron both testified about this incident.

**B. The Shooting of Robert Nelson on January 30, 2000**

The primary witness to the next charged shooting was Evans. Early on the morning of January 30, 2000, as he and Arrington left The Palace nightclub and walked to their cars, a white car pulled up and a man got out. Evans saw Arrington reach into the trunk of his car, pull out a .45-caliber gun, and begin shooting at the man, who fell to the ground. Shots then rang out from other quarters, and Arrington stopped shooting, closed the trunk of his car, and fled on foot.[3] Arrington told Evans the next day that he was shooting at Robert Nelson, a Mahdi gang member whom Evans had not recognized. Nelson sustained bullet wounds in his hip, groin, and leg, but he survived.

**C. The Murder of Danny Webb on February 29, 2000**

Evans and Payne testified that on the morning of February 29, 2000, Payne, at Arrington's instruction, drove Arrington, Hagans and Evans into Mahdi territory. As they came to the corner of Thirteenth and Taylor Streets, Hagans noticed Danny Webb, a Mahdi gang member, and pointed him out to the others.

---

[3] Two cooperating former Mahdi gang members, Hooker and Tabron, testified that Nadir Madhi later told them it was he and another Mahdi who had returned Arrington's fire.

Arrington declared they should "light him up." Payne pleaded with them not to hurt Webb, who was his friend, but Arrington and Hagans ordered him to pull up to Webb and stop the car, which he did. While Payne remained seated, Arrington, Hagans and Evans exited the vehicle. The three men shot at Webb, chasing him into an alley before eventually returning to their car and driving off. A neighbor saw Webb flee down the alley and collapse at his front porch. Webb suffered nine gunshot wounds and died later that day.[4]

### D. Further Shootings in the Wake of Webb's Murder

The murder of Webb was followed in the next several weeks by a number of shooting incidents involving Delafield and Mahdi gang members.[5] Not long after Webb's funeral, three of the Mahdi brothers drove with other members of their gang to the Delafield neighborhood and surprised a group that included three of the appellants—Arrington, Hagans, and Allen—as well as Evans, Payne, and Marquet McCoy. There was a brief exchange of gunfire, in which no one was injured. Next, on March 12, 2000, Hagans and Arrington, accompanied by Evans, fired on

---

[4] As part of their cooperation plea agreements, Evans and Payne each had pleaded guilty to second-degree murder for their participation in Webb's shooting.

[5] Testimony about these incidents was provided by cooperating witnesses from both gangs.

a car in which they thought Mahdi gang members were riding. One of the vehicle's occupants, who was not a member of the Mahdi organization, was injured.

Two months later, on May 10, 2000, Jason Smith drove Hagans and Arrington in a stolen car to the 3900 block of Fourteenth Street, where the three men fired shots at suspected Mahdi gang members, apparently including Rahammad Mahdi. In revenge, Abdur and Nadir Mahdi returned to Delafield territory that night and shot at Payne and McCoy, wounding the latter. According to Payne, members of the Delafield gang, including all of the appellants here, discussed the need to retaliate against the Mahdis. Approximately four days later, Arrington and Hagans armed themselves with assault rifles and, with Payne driving, went looking for Mahdi gang members. When they arrived, eventually, at the intersection of Fourteenth and Monroe Streets, Northwest, Arrington and Hagans got out and started shooting at an individual who fled on foot down Monroe Street. (Payne, who recounted this incident at trial, could not tell who the targeted individual was and did not know if anyone was injured in the shooting.)

**E. The Murder of Eva Hernandez and Shooting of Gloria Flores-Bonilla on May 17, 2000**

At around 5:00 in the afternoon on May 16, 2000, Payne drove Arrington, Hagans, and Leaks in Evans's burgundy Chevy Caprice down Fourteenth Street on what was apparently a reconnaissance expedition to "see," as Payne testified, "if there was anything out."[6]  From James Hamilton's front porch at 3924 Fourteenth Street,[7] the Caprice was observed by Nadir Mahdi.  He left the porch, ran after the car, and started shooting at it with a handgun.[8]  Its occupants, being without their weapons, did not return his fire.  They drove off unhurt, though the vehicle was hit by several bullets.  Payne recounted that on their way back home, Arrington and Hagans vowed revenge, saying that they were "going to go back down there and light them [Mahdis] up."  Arrington stated that he would have Jason Smith steal some cars so they could return to Fourteenth Street to retaliate.

---

[6]  Evans was not with them.  He had been arrested on May 9, and was not released until May 19, 2000.

[7]  Hamilton, one of several witnesses who testified about this incident at trial, allowed the Mahdi gang to use his porch to deal drugs.

[8]  At trial, both Payne and Hamilton described the incident and identified Nadir Mahdi as the shooter.  Nadir Mahdi admitted he was the shooter to David Tabron, a gang member who also testified.  In addition, as we discuss below, the jury heard that Nadir Mahdi admitted to this shooting when he pleaded guilty in federal court.

Later that night, Smith, Hagans, Arrington, and Payne went out and stole two Honda Accords, one gray and the other burgundy.[9] In a meeting with Allen and Leaks at an alley near Hagans's house, it was agreed that Payne and Smith would drive the group in the two Accords to Fourteenth Street, where appellants would emerge from the vehicles and shoot Mahdi gang members. The six men then went to Sean Gardner's apartment building to obtain firearms for Allen and Leaks.

Thus it came to pass, according to the government's witnesses,[10] that early in the morning on May 17, 2000, Payne and Smith drove Arrington, Hagans, Allen, and Leaks to Fourteenth Street to retaliate against the Mahdis. Payne drove Arrington and Hagans in the gray Accord, and Smith followed them with Allen and Leaks in the second car. The six men were heavily armed, with handguns, assault rifles, and a shotgun. After arriving on Fourteenth Street, the cars stopped

---

[9] The cars' owners testified they had parked them on the street between 7:00 and 8:00 that evening. When the police found the abandoned vehicles several hours later, their ignitions had been pulled out, which was the method Smith testified he had used to steal them.

[10] The primary testimony at trial about appellants' actions was provided by Payne and Smith (who each had pleaded guilty to second-degree murder for their involvement), and by Gardner, who did not accompany appellants but saw them just before they drove off to Fourteenth Street and again when they returned from the shootings there.

at the house where they had seen Nadir Mahdi on the porch earlier in the day. Appellants proceeded to fire in its direction; Payne testified that the shooting lasted "a couple of minutes," during which he saw some movement in the area at which they were firing. The shooting caused widespread damage to the targeted house and nearby cars and buildings.[11]

Eva Hernandez, a woman who lived with her family next door to the targeted house, at 3922 Fourteenth Street, had just returned home from the laundromat with her two sons and was unloading her car when the shooting started. She was shot in the neck and died on the front steps of her house. According to subsequent analysis, the bullet and bullet fragments recovered from her body were fired by one of the assault rifles, a Mac-90. Gloria Flores-Bonilla, who lived a couple of doors down at 3928 Fourteenth Street, was sitting in her bed when she was grazed in the back by a .45-caliber bullet that came through her window.

---

[11] At the start of the shooting, Smith was grazed on the head, apparently by broken glass or shrapnel. He got out of the car and started running, firing his gun as he did so until the weapon jammed. He left the area and eventually made his way back to his own neighborhood on foot. In Smith's absence, Leaks took over the wheel of the burgundy Accord.

In a few minutes, the shooting stopped and appellants drove back to the alley behind Gardner's building, where they dropped off Arrington and Hagans.[12]  Allen, Leaks, and Payne took the stolen Accords and left them in an alley next to Rock Creek Cemetery.  They then walked back to Gardner's building.  Shortly after they rejoined Arrington and Hagans there, Smith reappeared; displaying his bloody head wound, he explained why he had run away on Fourteenth Street.[13]  At Arrington's direction, Allen, Leaks, and Payne returned to the stolen Accords to wipe them down and to dispose of expended shell casings remaining in the cars by throwing them into the cemetery.

---

[12]  On the way, Leaks inadvertently crashed the burgundy Accord into the back of the gray Accord when Payne stopped the car because Arrington wanted to shoot someone getting out of a parked truck.  Both automobiles were damaged in the collision.

[13]  Before the six men dispersed, they met with Gardner and told him what they had done on Fourteenth Street (though at this juncture they did not yet know whether they had shot anyone).  Gardner recounted their incriminating admissions at trial.  Some of the participants in the raid on Fourteenth Street subsequently admitted their involvement to others who also were to become prosecution witnesses:  Arrington spoke about it with Evans and Antonio Hardie (who bought marijuana from him); Leaks and Allen admitted their complicity to McCoy; and Payne told what happened to Evans and his future wife, Tamika Payne (both of whom recounted his statements at trial; they were admitted as prior consistent statements to rebut charges of fabrication motivated by his subsequent cooperation with the prosecution).

Just a few hours later that same morning (before 8 a.m.), the police found the Accords by the cemetery where they had been abandoned. From the rear door of the gray Honda, they obtained Hagans's fingerprint. The police also recovered shell casings from the vehicles and, eventually, from the cemetery.

**F. The Shooting of Arrington on May 26, 2000**

The warfare between the Delafield and Mahdi gangs continued after May 17, 2000. Of relevance for present purposes, on the afternoon of May 26, 2000, Abdur and Nadir Mahdi ambushed Arrington as he was working on his car parked on Sheridan Street. Arrington sustained a gunshot wound in the left side of his chest.[14] He later told Evans, McCoy, and Hardie that he had managed to fire back at his assailants, one of whom he identified as a Mahdi.

**G. The Roxboro Place Shooting on June 3, 2000**

Over Arrington's objections, the trial court permitted the government to present evidence of a shooting on June 3, 2000, in an alley off of Roxboro Place,

---

[14] Abdur Mahdi admitted the shooting to members of his gang who testified at appellants' trial. Nadir Mahdi admitted his involvement in his guilty plea proffer.

Northwest, even though it was not part of the Delafield gang's feud with the Mahdi organization and no charges arising out of this incident were included in the indictments in this case. The evidence was admitted solely for its relevance in establishing Arrington's possession of two firearms that had been used (according to ballistics evidence and expert testimony) in the Hernandez, Webb, and other Mahdi-related shootings for which Arrington was on trial—a Ruger handgun and a Mac-90 assault rifle.[15] Given this limited purpose, and to avoid undue prejudice to Arrington, the jury was not told that two persons were killed in the June 3 shooting. The government introduced its evidence concerning the incident through multiple witnesses, the most important being Delafield cooperators Evans and Smith. Evans had pleaded guilty to one count of assault with intent to kill while armed for his own participation in the Roxboro Place shooting.

As Evans testified, he was selling marijuana on Delafield Place shortly before noon on June 3, 2000, when Arrington drove up in a Cadillac that Smith had stolen the previous evening.[16] Arrington asked Evans to come with him to help

---

[15] The trial court also permitted the government to introduce evidence of another shooting unrelated to the Delafield-Mahdi feud for the same evidentiary purpose. As no issue is raised on appeal about this ruling, we refrain from summarizing the evidence of this other shooting incident.

[16] Smith testified to having stolen the car.

him jumpstart Arrington's own car, an RX-7.  Evans got in the Cadillac and saw three guns in the vehicle:  a nine millimeter Ruger, a black .45 caliber pistol, and a Mac-90.

When Arrington and Evans arrived at Arrington's car, they saw a burgundy Mazda drive up the street and turn into an alley immediately in front of them. Arrington told Evans that this Mazda had been following him all morning and that he wanted to find out why.  The pair proceeded to follow the Mazda.  They saw it stop at the end of the alley, behind Roxboro Place, and watched a pedestrian walk up to it and transact some business—apparently a drug buy—at its window.

According to Evans, Arrington then exited the Cadillac with his Ruger and immediately started shooting at the Mazda.  Evans followed suit, firing the .45 caliber handgun he found in the Cadillac at an occupant of the Mazda who fled on foot.  Arrington returned to the Cadillac, retrieved the Mac-90, and continued shooting with it.  When Arrington finally stopped shooting, he and Evans ran back

to the Cadillac and drove to the vicinity of Delafield Place, where Arrington dropped Evans off.[17]

In the alley where the shooting occurred, police found and collected what a mobile crime scene officer described as "a tremendous amount of firearm evidence." A firearms examiner who had analyzed this evidence, comparing it to the ballistics evidence recovered by police from the Mahdi-related shootings, testified that it included (1) nine shell casings expelled by the same Ruger used in the shootings of Webb, Tabron, Vance, and Arrington; (2) twenty-five shell casings and four bullets or bullet fragments from the Mac-90 used in the shooting of Hernandez and in the shooting on 14th and Monroe Streets on May 14 or 15; and (3) one .45-caliber shell casing expelled from the same gun used in the Webb, Nelson, Vance, and Flores-Bonilla shootings.

The day after the Roxboro Place shooting, the police found the stolen Cadillac parked near Rock Creek Cemetery. Among the items of evidence found

---

[17] Evans's account of the incident was corroborated at trial by several witnesses on the scene. In addition, Payne, McCoy, and Hardie testified that Arrington had told them of his involvement in the Roxboro Place shooting.

inside the vehicle were a burnt cigarette with Arrington's DNA on it, and a cassette tape bearing Jason Smith's thumbprint.

## II. Appellants' Claims of Error

In seeking reversal of their convictions, some or all appellants challenge several rulings respecting the government's evidence at their joint trial. The rulings, in the order we shall discuss them, allowed the government to introduce (1) the Mahdi brothers' guilty plea proffers, (2) extrajudicial statements of non-testifying co-defendants, (3) evidence of Arrington's involvement in the uncharged Roxboro Place shooting, and (4) contingently, Jason Smith's prior consistent grand jury testimony. Appellants also contend the court erred (5) by allowing the government in its closing arguments to make improper reference to Charles Payne's grand jury testimony. Finally, appellants Allen and Leaks argue that (6) the trial court abused its discretion in denying their motions for separate trials because the evidence against them was minimal compared to the evidence against their co-defendants; and that (7) the government did not present sufficient evidence that either of them had a specific intent to kill in connection with the shootings of Hernandez and Flores-Bonilla, the *mens rea* required to support their convictions for first-degree murder and AWIKWA.

## A. The Mahdi Plea Proffers

In 2001, the Mahdi brothers were indicted on multiple criminal charges related to their gang's narcotics distribution conspiracy. Four of the five brothers eventually pleaded guilty to the conspiracy in federal district court, and Nadir and Rahammad Mahdi also pleaded guilty to having attempted to kill Arrington and his associates.[18] In tendering their guilty pleas, the Mahdi brothers agreed to factual proffers prepared by the government. They did not agree to cooperate with the government, however, and they asserted their Fifth Amendment privileges not to testify at appellants' trial.

Over appellants' objections, the trial court allowed the government to introduce redacted versions of the Mahdi brothers' plea proffers in evidence as statements against penal interest.[19] As presented to the jury in their redacted form, the plea proffers described the Mahdi organization's drug-distribution operations

---

[18] The fifth brother, Abdur Mahdi, was convicted after trial. *See United States v. Mahdi*, 598 F.3d 883 (D.C. Cir. 2010).

[19] The trial court redacted the proffers of Nadir and Rahammad Mahdi by (1) replacing references to "Brion Arrington and his associates" with "Brion Arrington and others" and (2) removing references to specific shootings allegedly perpetrated by Arrington and his associates and substituting the phrase "acts of violence against members of the Mahdi organization."

and other criminal activities, including numerous acts of violence that its members had committed against rival drug dealers unrelated to the Delafield organization. In addition, Nadir and Rahammad Mahdi's redacted proffers stated that they and other Mahdi gang members had conspired to kill "Arrington and others, because they believed that Arrington and others were responsible for acts of violence against members of the Mahdi organization." Nadir Mahdi's proffer described how (1) on May 16, 2000, he and other gang members were sitting out on a front porch on Fourteenth Street when he saw and shot at a car containing Arrington and others; and (2) on May 26, 2000, he and other members of the Mahdi gang shot and wounded Arrington with the intent to kill him.

Before the proffers were read into the record, the trial court informed the jury that the four Mahdi brothers had pleaded guilty in district court and had admitted, under oath, the criminal activity described in the proffers. After the proffers were read, the trial court explained to the jury that they were admitted only to show what Nadir and Rahammed Mahdi believed and the background of the alleged relationship between the Mahdi and Delafield gangs, and that the proffers were not evidence that Arrington "or anyone else" (other than the Mahdis) "did anything."

Appellants objected to the admission of the plea proffers on Confrontation Clause grounds. In light of the Supreme Court's subsequent decision in *Crawford v. Washington*[20] and this court's decisions thereafter in *Morten v. United States*[21] and *Williams v. United States*,[22] the government concedes, correctly, that the admission of the plea proffers at appellants' trial violated their Sixth Amendment right of confrontation and hence was an error of constitutional magnitude. As such, and because the claim of error was preserved by timely and specific objections, "reversal is required unless it is shown 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"[23] The burden on the government to establish harmlessness beyond a reasonable doubt is a heavy one, but it is not necessarily insurmountable. "'In some cases, the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the

---

[20] 541 U.S. 36, 53-54 (2004) (holding that the prosecution's introduction in evidence of a testimonial statement from a witness who does not appear at trial violates the Confrontation Clause of the Sixth Amendment unless the witness is both unavailable to testify and the defendant had a prior opportunity for cross-examination).

[21] 856 A.2d 595, 600 (D.C. 2004) (holding that appellants' right of confrontation was violated by the admission of declarations against penal interest made by non-testifying co-conspirators when they entered guilty pleas).

[22] 858 A.2d 978, 981 (D.C. 2004) (same).

[23] *Morten,* 856 A.2d at 600 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[improperly admitted evidence] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the [evidence] was harmless error."[24] The factors that bear on whether a Confrontation Clause violation was harmless include "the strength of the government's case, the degree to which the statement was material to a critical issue, the extent to which the statement was cumulative, and the degree to which the government emphasized the erroneously admitted evidence in its presentation of the case."[25]

In *Morten* and *Williams*, where we held that the Confrontation Clause violation was not harmless beyond a reasonable doubt, the erroneously admitted plea proffers were made by the appellants' co-conspirators, and they provided substantial and direct proof of both the conspiracy and the substantive charges against the appellants.[26] In this case, neither of those things was so: The

---

[24] *Morten,* 856 A.2d at 600-01 (quoting *Schneble v. Florida*, 405 U.S. 427, 429 (1972)).

[25] *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006); *see also id.* at 90 (concluding that the unconstitutional admission of co-conspirators' guilty plea allocutions to establish two essential elements of a conspiracy charge was harmless beyond a reasonable doubt, given, *inter alia*, "the brevity of the government's mention of the plea allocutions, the purely cumulative character of the statements, and the strength of the government's case").

[26] The appellants in *Morten* and *Williams* were charged with having conspired, as members of the Stanton Terrace Crew, to kill members of a rival

*(continued…)*

improperly admitted extrajudicial statements were not those of appellants' co-conspirators, but rather were made by members of the rival gang; and the statements did not directly incriminate appellants or prove any of the charges against them. Nonetheless, appellants claim, the Mahdi plea proffers were as prejudicial as the extrajudicial statements in *Morten* and *Williams*, and for much the same reasons.

First, appellants argue, the plea proffers tended to prove the existence of the charged conspiracy by showing its "mirror-image," or what the prosecutor called in his rebuttal argument "the other side of the equation." That the Mahdis conspired to retaliate against "Arrington and others" for their acts of violence implied, it is said, that "Arrington and others" had conspired to commit and committed such acts (and, perhaps, that Arrington was one of the leaders of the conspiracy). Moreover, appellants contend, Nadir Mahdi's admission that he shot at "Arrington and others" on May 16, 2000, established a motive for appellants—

---

*(continued…)*
gang, the Parkland Crew, and with substantive crimes in furtherance of that conspiracy. To prove both the conspiracy and the substantive offenses, the government relied heavily on out-of-court declarations against penal interest by two members of the Stanton Terrace Crew. These declarations were contained in the transcripts of their plea colloquies when they pleaded guilty shortly before trial, and in the videotape of a statement given by one of them to the police.

Arrington, in particular—to commit the shooting that night in which Eva Hernandez was killed and Flores-Bonilla was wounded.[27]  Finally, appellants argue that the description of the May 16 shooting in Nadir Mahdi's proffer served to bolster the credibility of Charles Payne, a key prosecution witness.[28]

---

[27]  In his rebuttal argument, the prosecutor asked the jury, "[W]hat happened on May 16, seven hours before Eva Hernandez [was killed].  Nadir Mahdi came off the porch?  Is that true?  On this evidence it is unquestionably true.  We got a guilty plea from the man who did it for goodness sake."  It must be noted that the prosecutor proceeded immediately to remind the jury that Nadir Mahdi's guilty plea was not the only evidence of this:  "You have heard from numerous witnesses, you heard from live witnesses who told you that Nadir Mahdi did that."

[28]  As the prosecutor told the jury, "[i]f you believe Charles Payne—forget about all the other evidence, if you believe Charles Payne alone, you have sufficient evidence beyond a reasonable doubt to convict these four defendants of what happened to Eva Hernandez."  The prosecutor cited the consistency of Payne's testimony with the facts recounted in Nadir Mahdi's plea proffer as one reason to find Payne credible.  In his initial closing argument, for instance, the prosecutor stated:

> Nadir M. Mahdi pled guilty to [the May 16 shooting] in federal court the date, February 21st, 2003.  Less than a year ago.  Charles Payne came to the grand jury in September [of] the year 2000.  So when Charles Payne sits on the witness stand and tells you I drove through that block with Brion Arrington and others, you saw his testimony, that's what we would ask you to consider first.  But remember Nadir Mahdi pled guilty to doing just that.  Just like Charles Payne tells you.  Something Charles Payne could have absolutely no way of knowing.

In response, the government contends that the improper admission of the plea proffers did not prejudice appellants because: (1) the proffers themselves were "entirely cumulative of other evidence presented by multiple, live witnesses at trial;" (2) the issues the proffers addressed were "peripheral; none of them provided any direct proof at all of appellants' guilt of the charged conspiracy or substantive offenses;" and (3) "although the government made use of the proffers in its closing and rebuttal arguments, they were hardly the central focus of the government's case, which presented overwhelming evidence of appellants' guilt through the consistent testimony of numerous independent witnesses, corroborated by extensive firearms and other forensic evidence."[29]

Considering the record of appellants' ten-week trial in its entirety, we conclude that the government has carried its burden of establishing that the erroneous admission of the Mahdi plea proffers was harmless beyond a reasonable doubt. For the following reasons, we are satisfied that the proffers did not prejudice appellants.

---

[29] Brief of Appellee at 76.

To begin with, the government is correct in emphasizing that, unlike the testimonial hearsay of the defendants' coconspirators in *Morten* and *Williams*, the Mahdi plea proffers were not directly probative of any of the crimes charged in this case. The proffers did not assert the existence of the Delafield criminal organization or appellants' involvement in a conspiracy of any kind; nor did they mention any of the shootings with which appellants were charged. Although the proffers stated that Nadir and Rahammad Mahdi "believed" Arrington and others were responsible for (unspecified) acts of violence against the Mahdi organization, the proffers set forth no basis for that belief and were not offered or relied upon as evidence of its truth. To the contrary, the trial court instructed the jury that the proffers were "not any evidence" that Arrington or his co-defendants "did anything." Thus, even if the proffers' description of a Mahdi conspiracy *against* "Arrington and others" implied the existence of a "mirror image" conspiracy *by* Arrington and others against the Mahdi organization, the jury was inoculated against drawing that implication.

The government is also correct in stating that it relied on abundant admissible and probative evidence wholly apart from the plea proffers to prove the existence of the Mahdi and Delafield gangs, the feud between them, appellants' conspiracy, and appellants' commission of each of the shootings charged in their

indictments—evidence that included the *live* eyewitness testimony of a slew of witnesses associated with each of the two gangs. For the most part, the Mahdi plea proffers added nothing of consequence to this evidence; they were cumulative at best.

Citing *Morten*, appellants argue that the Mahdi plea proffers were qualitatively superior to the cooperating witnesses' in-court testimony because, in contrast to that testimony, the proffers were read to the jury without disclosure of "the advantages [the Mahdi defendants] secured by pleading guilty and incriminating" Arrington and others.[30] But even setting aside the fact that the Mahdi brothers did *not* incriminate appellants (and thus their proffers were decidedly inferior, from the prosecution's perspective, to the cooperating witnesses' in-court testimony), this case is not comparable to *Morten*. Here, unlike in *Morten*, the jury was informed that the proffers were statements adopted as part of guilty pleas.[31] Thus, appellants were in a position to argue, and the jury was in a position to understand, the possible motivations of the Mahdi brothers, including

---

[30] *Morten*, 856 A.2d at 601.

[31] In *Morten*, the jury was told only that the transcribed statements had been made in an "official proceeding" of an unspecified kind. *Id.* It was not disclosed that the statements were made pursuant to plea agreements.

the incentive to curry favor with the government to gain a more lenient sentence.[32]
Moreover, as the government points out, appellants were free to impeach the
Mahdi brothers with their plea agreements or in any other permissible way, even
though they did not testify.[33]

What we must focus on is Nadir Mahdi's proffer and the support it alone of
the four proffers provided to the government's proof of appellants' commission of
the shooting on May 17, 2000, in which Eva Hernandez was killed and Gloria
Flores-Bonilla was wounded. Nadir Mahdi's proffer did not add to the mass of
incriminating evidence directly; it did not say anything at all about the May 17
shootings. But what the proffer did do was describe the incident that, according to
Payne, precipitated the attack on Fourteenth Street. Nadir Mahdi's admission to
having shot at Arrington and his associates on the afternoon of May 16
corroborated Payne's testimony on this point and helped establish a motive for
appellants to retaliate.

---

[32] Making that very point, Hagans's counsel asserted in closing argument
that plea proffers were "not worth the paper they're printed on because the
government makes the proffer, they put down what they want, you either sign it or
you don't."

[33] *See Watkins v. United States*, 846 A.2d 293, 298 (D.C. 2004) (citing
Federal Rule of Evidence 806, which permits the impeachment of a non-testifying
declarant whose hearsay statement has been admitted in evidence).

We are not persuaded, however, of the importance of this contribution by Nadir Mahdi to the evidence against appellants. As summarized above, appellants' involvement in the May 17, 2000, raid was established at trial by multiple witnesses in addition to Payne, including: (1) Smith, who, like Payne, admitted to having participated in the raid himself; (2) Gardner, who witnessed appellants' activities immediately before the raid, and talked with them about it immediately afterward; (3) Evans and Hardie, to whom Arrington admitted his involvement; and (4) McCoy, to whom Leaks and Allen did likewise. In addition, the government presented the evidence that Hagans's fingerprint was found on the door of one of the stolen Accords and corroborative ballistics evidence.

There likewise was substantial corroboration at trial, apart from Nadir Mahdi's plea proffer, of Payne's testimony about the May 16, 2000, incident in which Nadir shot at Arrington. As previously mentioned, two of Nadir Mahdi's own associates (James Hamilton and David Tabron) confirmed that he committed the May 16 shooting, and Kevin Evans and Tamika Payne testified to Payne's prior consistent statements about the incident (given before he had any reason to fabricate).[34] While Payne, testifying pursuant to a cooperation plea agreement and

---

[34] Based on a physical description given by a neighbor, Hagans argued that the shooter was Joseph Hooker, not Nadir Mahdi. The government argued that the

*(continued…)*

facing the prospect of a potentially lengthy sentence for the crimes to which he had pleaded guilty, was hardly a disinterested witness, his detailed testimony was not materially undermined or contradicted despite appellants' strenuous efforts to discredit him.[35]

Appellants argue that the critical importance of the Mahdi plea proffers to the government's case against them, and thus the likelihood of prejudice from their admission in evidence, is shown by the prosecutors' reliance on the proffers in

_____

*(continued…)*

description was unreliable, but in any case, because Hooker was a Mahdi gang member himself, it was scarcely material whether he instead of Nadir Mahdi was the shooter, and the attempt to undercut Payne on this point did not affect his credibility significantly. Payne's account of the May 16 shooting, and in particular his testimony as to who was present with him in the car, was otherwise uncontradicted.

[35] It appears that Payne made a compelling witness, one credibly motivated not only by his admitted hope of some leniency at his sentencing, but also by sincere remorse and a genuine desire to accept responsibility. He haltingly described, for instance, how he tried not to watch as Arrington, Hagans, and Evans repeatedly shot his friend, Danny Webb, over his protestations. His testimony, which extended over hundreds of pages of transcript, was remarkably consistent, both internally and with the other testimonial and physical evidence presented at trial. When the prosecutor asked the jury in closing argument and rebuttal to believe Payne, he emphasized "first and primarily his testimony day after day in this courtroom, with four lawyers questioning him[,] [d]irect, non-evasive, straightforward."

their closing and rebuttal arguments.[36]  We do not agree.  We recognize that "[a] prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial."[37]  In this case, however, and unlike in *Morten*, the erroneously admitted plea proffers were far from central or critical to the case that the government laid out.  In several hours of argument, spanning some 240 pages of transcript, we count only seven instances in which the prosecutors mentioned the proffers, two in the initial closing argument and five in the rebuttal.  Far from being the centerpiece, fulcrum, linchpin or the like, the proffers were essentially cumulative and peripheral.  The prosecutors cited them as just one helpful but by no means essential piece of evidence that supported the government's case.

So, to take appellants' chief example, the prosecutors did cite Nadir Mahdi's plea proffer as evidence that corroborated Payne's testimony about the May 16 shooting.  But it was not the only such corroboration, the prosecutor emphasized, nor did it outshine all the rest.  The prosecutors also cited the testimony of Hamilton and other witnesses to the incident, and that of Tamika Payne, to whom

---

[36]  The United States was represented at trial by two prosecutors; one made the government's initial closing argument and the other gave the rebuttal.

[37]  *Morten*, 856 A.2d at 602 (internal quotation marks and brackets omitted).

Payne had described what happened; and ballistic and other physical evidence supporting Payne's account that Nadir Mahdi left the porch and shot at Arrington and the others in the car Payne was driving. Nadir Mahdi's plea proffer did not become key evidence against appellants merely because the prosecutors invoked it as one of many pieces of evidence corroborating Payne's testimony.[38]

In sum, we conclude that the government has overcome the high bar set by the *Chapman* standard of harmlessness for constitutional error.[39] We are

---

[38] The prosecutors also mentioned Nadir Mahdi's plea proffer when they discussed the May 26 gunfight between Arrington and Mahdi gang members. But that event was important primarily because it generated ballistics evidence (a shell casing from Arrington's 9-millimeter Ruger handgun) linking Arrington to other shootings; Nadir Mahdi's admission to having shot Arrington in the incident was only marginally significant in this connection, and it was cumulative evidence of the shooting at most. The plea proffer was not part of the evidence tying Arrington to the Ruger.

Finally, at the tail end of the rebuttal argument, the prosecutor made brief references to the plea proffers as supporting the government's contentions that the Mahdi Brothers criminal enterprise existed and that the Mahdis were "at war" with the Delafield organization. But, as we have said, these facts were proved virtually beyond peradventure by other evidence at trial, including the well-corroborated testimony of several cooperating witnesses from both gangs.

[39] *See Chapman v. California*, 386 U.S. 18, 24 (1967).

persuaded that there is no reasonable possibility the improper use at trial of the Mahdi guilty plea proffers contributed to appellants' convictions.[40]

## B. Extra-Judicial Statements of Co-Defendants

Appellants present two distinct but related claims of error in the admission of the testimony concerning their out-of-court admissions. One of the claims concerns whether this evidence should have been excluded because the jury was instructed on vicarious liability. The other claim focuses on whether one witness's testimony, recounting admissions made by appellant Leaks, was sufficiently redacted to avoid prejudice to the other appellants.

Although we address these two claims separately, they are related in that each claim invokes the same underlying evidentiary limitation, in multiple defendant trials, on the permissible use of statements made by one defendant that come within the party opponent exception to the rule against hearsay. (Because the statements at issue in this case were non-testimonial, we focus solely on the rule against hearsay and not on the Confrontation Clause.) When such a statement is not independently admissible against the non-declarant co-defendants, care must

---

[40] *See Morten*, 856 A.2d at 601.

be taken to ensure that it is considered as evidence only against its maker and not against the other defendants in violation of the general prohibition against the use of hearsay. As we explain below, in cases where defendants may be convicted on a theory of vicarious liability, admitting party opponent statements might make it possible for all defendants to be convicted based on statements that are hearsay as to all but one of them, an unacceptable outcome that we rejected in *Akins v. United States*.[41] This concern is not alleviated by an effective redaction of the statement because the statement need only implicate one defendant to create the problem recognized in *Akins*. Further, aside from the issue of vicarious liability, admitting a confession of one defendant, as the statement of a party opponent, may conflict with the rule against hearsay to the extent the confession implicates other defendants. Even when the confession is introduced with an appropriate limiting instruction, it may have to be redacted efficaciously to prevent the jury from using it improperly against the non-declarant co-defendants.

---

[41] 679 A.2d 1017, 1031 (D.C. 1996).

## 1. The Vicarious Liability Problem

Appellants contend that because the jury was given a *Pinkerton* instruction on the vicarious liability of all co-conspirators for substantive crimes committed by any of them in furtherance of the conspiracy,[42] the trial court erred in admitting certain of their out-of-court statements under the hearsay exception for statements of party opponents,[43] even with redactions and limiting instructions.[44] Admission of the extrajudicial statements, appellants argue, violated this court's holding in *Akins v. United States* that "in a joint conspiracy trial where the government relies on a theory of vicarious liability, statements may not be introduced under the statements of party opponent exception to the rule against hearsay—or any other

---

[42] *See Pinkerton v. United States*, 328 U.S. 640 (1946); *see also Gordan v. United States*, 783 A.2d 575, 582 (D.C. 2001).

[43] *See Chaabi v. United States*, 544 A.2d 1247, 1248 n.1 (D.C. 1988).

[44] Specifically, appellants cite (1) Leaks's admission to McCoy that "[he] and five others" were involved in the May 17 shooting; (2) incriminating statements made by Arrington to Payne, Gardner, and Evans, and by Arrington and Hagans to Smith, regarding the May 17 shooting; (3) testimony of McCoy that Arrington asked him to "handle" Payne's "snitching" in order to prevent Payne from testifying; (4) Gardner's testimony that, shortly after the shooting on May 17, he heard an unidentified conspirator say the group "rode through, seen [*sic*] someone standing on the porch, started firing and left;" and (5) Arrington's statements, recounted by Hardie, that he did not notice when someone approached him with a gun on May 26 because he was working on his car, and that he was "lucky he had his own gun on him" so he could shoot back.

hearsay exception that is not reliability-based—unless they are admissible as coconspirators' statements in furtherance of the conspiracy."[45]

The reason for this rule is that a vicarious liability instruction may undercut the condition under which a properly redacted party opponent statement may be admitted in a joint trial—namely, the condition, on which the jury must be instructed, that the statement is to be considered as evidence only against its maker and not against the other defendants.[46] The problem arises when the prosecution proves that the defendants in a joint trial were engaged in a conspiracy and relies on a party opponent statement to prove that the defendant who made it committed a substantive crime in furtherance of the conspiracy. If the jury accepts that proof and finds the declarant defendant guilty of the substantive crime, vicarious liability renders the other defendants guilty of it as well *on the same evidence*, including the

---

[45] *Akins v. United States*, 679 A.2d 1017, 1031 (D.C. 1996).

[46] Under traditional rules of hearsay, a defendant's extrajudicial statement, offered solely as the admission of a party opponent and not under any other hearsay exception, is inadmissible against a co-defendant. *(Keith) Thomas v. United States*, 978 A.2d 1211, 1222 (D.C. 2009). Moreover, if the statement is testimonial in nature and the declarant defendant does not testify at trial, the statement is also inadmissible against a co-defendant under the Confrontation Clause of the Sixth Amendment. *Id.* at 1222-23. As we discuss further below, even with an appropriate limiting instruction, redaction of the statement may be necessary to remove incriminating references to co-defendants at a joint trial. *Id.* at 1223-24.

hearsay evidence that could not be considered against them, even if they were not personally involved in the crime themselves. In this way, the vicarious liability instruction may contradict and vitiate the limiting instruction under which the hearsay was admitted.[47]

*Akins* framed its rule against the admission of party opponent hearsay in joint conspiracy trials not merely as an application of traditional rules of evidence, but specifically to protect the Confrontation Clause rights of the non-declarant defendants as those rights were understood in the era before the Supreme Court decided *Crawford v. Washington*.[48] While the *Akins* rule as stated is no longer a

---

[47] *See Akins*, 679 A.2d at 1031 (declaring that "no limiting instruction can cure" the problem); *but see id.* at 1037 ("We need not decide whether *any* limiting instruction, combined with the *Pinkerton* charge, would set too contradictory a mental task before the jury.") (Farrell, J., concurring); *id.* at 1037-39 (Schwelb, J., concurring in part and dissenting in part); *Erskines v. United States*, 696 A.2d 1077, 1080 n.4 (D.C. 1997) (explaining that, in view of the separate opinions of Judges Farrell and Schwelb, the decision in *Akins* "left open the question whether a more pointed limiting instruction than the one given in *Akins*" could avoid the problem in a case in which a vicarious liability instruction is given).

[48] 541 U.S. 36 (2004). *See Akins*, 679 A.2d at 1030 (citing *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), for the proposition, later overruled in *Crawford*, that the Confrontation Clause is not violated by the admission of incriminating extrajudicial statements under "a recognized hearsay exception based on the statements' presumed reliability").

good fit with Confrontation Clause principles,[49] it retains its logic and validity under non-constitutional rules of evidence.[50] Hence we consider *Akins* applicable even where no Confrontation Clause issue is presented because, as in the present case, the hearsay at issue—appellant's statements to fellow gang members and associates—was not testimonial in nature.[51]

However, although appellants objected on other grounds to the introduction of their out-of-court statements, an objection under *Akins* was never made at trial. We do not mean to suggest that appellants needed to cite *Akins* by name to preserve their objection for appellate review; but "appellants' failure to either cite to *Akins* or object that the combination of the admission of [their co-defendants'] redacted statements and the *Pinkerton* instruction would violate their . . . rights

---

[49] This is primarily because, per *Crawford*, the Confrontation Clause applies to testimonial hearsay regardless of whether it falls within an exception (reliability-based or otherwise) to the rule against hearsay, but not at all to non-testimonial hearsay. *See Davis v. Washington*, 547 U.S. 813, 821 (2006).

[50] *See (Keith) Thomas*, 978 A.2d at 1225 ("Whether or not it is testimonial, a defendant's extrajudicial statement directly implicating a co-defendant is equally susceptible to improper use by the jury against that co-defendant.").

[51] *See id.* at 1226-27; *see also Perez v. United States*, 968 A.2d 39, 77 n.43 (D.C. 2009) ("Because the statement was made not to police, but to a perceived ally who was not then a government informant or witness, it was not testimonial and there was no right to cross-examination under the Confrontation Clause.").

meant that the trial court was not fairly apprised that appellants sought relief based on that claim."[52]  Accordingly, we review appellants' claim of an *Akins* violation only for plain error.[53]

> Under the established four-part test for plain error, an appellant must demonstrate not merely that there was an error, but also that the error was "clear" or "obvious"— "so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object."  In addition, the appellant must demonstrate that the error affected his substantial rights by showing a reasonable probability that it had a prejudicial effect on the outcome of his trial.  Lastly, even if the appellant succeeds in those demonstrations, he also must show that the error seriously affected the fairness, integrity or public reputation of the judicial proceeding.[54]

Importantly, "it is inherent in the nature of plain error review that appellant must make that showing based on the record on appeal."[55]

---

[52]  *Baker v. United States*, 867 A.2d 988, 1001-02 (D.C. 2005) (internal quotation marks omitted).

[53]  *Id.* at 1002.

[54] *Comford v. United States*, 947 A.2d 1181, 1189-90 (D.C. 2008) (footnotes omitted).

[55]  *Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010).

We cannot find plain error on the record here. For one thing, the record does not show clearly that the *Akins* rule was violated by the admission of the hearsay statements at issue here. There is every reason to suppose that at least some of those statements would have been "alternatively admissible" under a reliability-based hearsay exception (as contemplated by the *Akins* rule)—namely the exception for statements against penal interest.[56] Some of the statements also may have been admissible under the exception for statements by co-conspirators during the course of and in furtherance of the conspiracy (as also contemplated by *Akins*).[57] And one of the statements in issue, Arrington's alleged request that

---

[56] *Akins*, 679 A.2d at 1033. As we explained in *(Keith) Thomas*, 978 A.2d at 1227:

> The exception, a species of "statement against interest," provides that if the declarant is unavailable as a witness, the rule against hearsay does not exclude "a statement which at the time of its making so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." The premise of this exception is that reasonable people usually do not make statements against their penal interest unless the statements are true; the statements are reliable, and therefore admissible, precisely insofar as they genuinely increase the declarant's exposure to criminal sanction.

(Footnotes omitted.)

McCoy prevent Payne from testifying, does not appear to have been hearsay at all.[58]

In any event, in order to establish that the asserted error affected their substantial rights (the third requirement of plain error), appellants must show a reasonable probability that, but for the admission of their extrajudicial statements under the party opponent exception, the outcome of the trial would have been different.[59] They cannot make such a showing here. The statements were cumulative of other direct, compelling evidence of each appellant's personal involvement in the substantive crimes with which he was charged; we are confident that no appellant was found guilty of any offense in which he did not

_(continued…)_
[57] *See Butler v. United States*, 481 A.2d 431, 439-41 (D.C. 1984); *United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006) (recognizing that statements recounting past violent acts to fellow conspirators may fall within the exception for co-conspirator hearsay where they keep the co-conspirators informed or motivated).

[58] *See Jenkins v. United States*, 80 A.3d 978, 993 (D.C. 2013) (explaining that statements between conspirators not offered for the truth of the matter asserted are non-hearsay verbal acts).

[59] *See (Michael) Thomas*, 914 A.2d 1, 21 (D.C. 2006).

participate based on a theory of vicarious liability for the acts of another.[60]  For this reason too, appellants' claim that the admission of their co-appellants' extrajudicial statements was plain error falls short.

## 2. The Redaction Issue

Appellants' second party opponent hearsay claim is specific to cooperating witness Marquet McCoy's testimony recounting admissions by appellant Leaks. Before calling McCoy to the witness stand, the government informed the trial court and defense counsel that Leaks had told McCoy "chapter and verse" about the May 17 shootings, among other things "naming all five of his accomplices," but that "for *Bruton* reasons" the government had instructed McCoy to limit his testimony about Leaks's admissions so as to implicate only "Leaks and [unnamed] others."

On the stand, McCoy testified that a few days after the May 17 raid, Leaks gave him a detailed account of it and admitted having been "present and involved" himself.  The prosecutor asked McCoy whether Leaks had said who went with him on the raid; McCoy confirmed what he had indicated earlier in his testimony, that

---

[60]  *Cf. Baker*, 867 A.2d at 1003 (finding insufficient prejudice for reversal under plain error review where the co-defendant's statement was "both vague and cumulative of much weightier evidence").

Leaks had indeed named his confederates. The prosecutor then inquired how many there were. "It was him [i.e., Leaks] and five others," McCoy responded. Defense counsel objected and moved to strike the witness's answer as being violative of the *Bruton* doctrine because it plainly referred to Leaks's co-defendants. The trial court declined to strike the testimony but repeated its earlier instruction to the jury that a statement by a defendant could only be used against that defendant. McCoy then went on to testify to what Leaks told him about how the May 17 shootings had occurred.

On appeal, Allen argues that Leaks's statement to McCoy incriminated him by unavoidable inference even though it was redacted so as not to identify him by name—for it would have been obvious to the jury that the "five others" whom Leaks mentioned could only have been Leaks's three co-defendants (Arrington, Hagans, and Allen) and the government's two cooperating witnesses (Payne and Smith). We understand Arrington and Hagans to join in this contention. Accordingly, Allen asserts (on their behalf as well as his own) that because the hearsay statement was inadmissible against Leaks's co-defendants,[61] the trial court

---

[61] Despite the references in the trial court to *Bruton v. United States*, 391 U.S. 123 (1968), appellants properly do not complain of a Confrontation Clause violation. Leaks's statement, made in casual conversation to a fellow gang member, was not testimonial. See note 51, *supra*. The government does not

*(continued…)*

erred in admitting it without severing their trials from that of Leaks pursuant to Criminal Rule 14.[62]

Appellants' argument is not without merit. Rule 14 "requires that the trial court take appropriate steps to minimize the prejudice inherent in codefendant confessions which are inadmissible against the nondeclarant defendant."[63] "[T]he remedial options under Rule 14 when one defendant's extrajudicial statement directly inculpates a co-defendant are the same as under the Confrontation Clause: unless the government agrees to forego any use of the statement, it must be redacted to eliminate all incriminating references to the co-defendant, or the co-

---

*(continued…)*
suggest, however, nor do we think, that appellants failed to preserve their non-constitutional claim predicated on the inadmissibility of Leaks's statement against them under traditional hearsay principles.

[62] Super. Ct. Crim. R. 14 (providing, in pertinent part, that "[i]f it appears that a defendant . . . is prejudiced by a joinder of defendants . . . for trial together, the Court may . . . grant a severance of defendants or provide whatever other relief justice requires").

[63] *(Keith) Thomas*, 978 A.2d at 1223 (quoting *Carpenter v. United States*, 430 A.2d 496, 502 (D.C. 1981) (en banc)). It is not suggested that the portions of Leaks's statement implicating persons other than himself in the May 17 shooting could have been admitted against Leaks's co-defendants under the hearsay exception for statements against penal interest. *See Williamson v. United States*, 512 U.S. 594, 599-601 (1994); *(Keith) Thomas*, 978 A.2d at 1228-29.

defendant's motion for severance must be granted."[64]  Without adequate redaction,

a limiting instruction cautioning the jury to consider the statement only against its

maker "is not a sufficient prophylaxis."[65]

Here, of course, the statement *was* redacted; instead of identifying those

whom Leaks had named as his confederates, McCoy referred to them only in

neutral terms as "five others."  Thus, as it was summarized to the jury, the

statement did not directly incriminate Leaks's co-defendants on its face.  This is

important, because

> a defendant's extrajudicial statement normally may be
> admitted in evidence in a joint trial (with an appropriate
> limiting instruction, we emphasize) so long as the
> statement, as redacted if necessary, does not incriminate
> a non-declarant co-defendant *on its face*, either explicitly
> or by direct and obvious implication.  A statement
> satisfying that condition normally is admissible (with the
> limiting instruction) even though it alludes non-
> specifically to the declarant's confederates and the non-
> declarant co-defendant may be linked to it by other,
> properly admitted evidence of his guilt.[66]

---

[64] *Id.* at 1224 (internal quotation marks omitted).

[65] *Id.*

[66] *Id.* at 1235.

But, as we have emphasized, these principles "are guidelines for the mine run of cases, not ironclad rules for every case no matter what the circumstances."[67] There is a particular circumstance in this case that takes it out of "the mine run"— namely, the fact that the jury was informed that Leaks in fact had identified his confederates in the statement that McCoy reported. In other words, it was revealed to the jury that the statement had been redacted to omit the identities of the other participants in the May 17 shooting.

When a defendant's extrajudicial statement is redacted by replacing the co-defendants' names with neutral pronouns or other generic terms (such as "others"),

> the substitution must be accomplished artfully, so as not to indicate to the jury that the statement originally contained actual names. An obvious redaction would imply too strongly that the statement implicated the non-declarant co-defendant by name.[68]

---

[67] *Id.*

[68] *Id.* at 1237; *see, e.g.*, *Gray v. Maryland*, 523 U.S. 185, 193 (1998) (explaining that when the jury is aware that names have been deleted, the substituted language "will not likely fool anyone;" the jurors "would know immediately" whose names had been removed); *United States v. Jass*, 569 F.3d 47, 56 (2d Cir. 2009) ("[A] redacted statement in which the names of co-defendants are replaced by neutral pronouns, *with no indication to the jury that the original statement contained actual names*, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without

*(continued…)*

Transparently redacted statements "continue to incriminate the non-declarant defendant 'directly' and 'facially,'" to the extent that a limiting instruction alone usually cannot be deemed an effective remedy.[69]

We therefore cannot approve the redaction of Leaks's statement. The admission in this joint trial of McCoy's testimony summarizing what Leaks told him was error. That does not mean, however, that any of Leaks's three co-appellants are entitled to a new trial. We are persuaded by the government's alternative argument that, in light of the mass of other evidence of their involvement in the May 17 shootings, which we have summarized above, the error did not have a substantial impact on the jury's verdict and thus was harmless.[70]

## C. The Evidence of the Roxboro Place Shooting

In deciding whether to admit evidence of the uncharged Roxboro Place shooting, the trial court had to evaluate and balance the government's assertions of

---

*(continued…)*
violating a co-defendant's *Bruton* rights.") (internal quotation marks omitted; emphasis added).

[69] *(Keith) Thomas*, 978 A.2d at 1234 (quoting *Gray*, 523 U.S. at 196).

[70] *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

relevance against claims of prejudice raised by Arrington and Hagans. Ultimately, the court ruled evidence of the Roxboro Place incident admissible only for the limited purpose of showing Arrington's possession of firearms used to commit the shootings charged in the indictment;[71] and then only on condition that the jury not be informed anyone was killed in the assault.[72] The court overruled Arrington's objections that the government's true and improper purpose in presenting the Roxboro shooting evidence was to demonstrate his alleged propensity to commit violent crimes with firearms, and that even with the court's restrictions, the evidence was substantially more prejudicial than probative. The court also rejected Hagans's motion that he be tried separately from Arrington so that, in cross-examining Evans and other government witnesses, he would be permitted to elicit the fact that the Roxboro shooting resulted in a double homicide. Arrington and Hagans renew their contentions on appeal, and we address them in turn.

---

[71] The court rejected the government's alternative rationales that Arrington's involvement in the Roxboro shooting was otherwise probative of his identity as one of the shooters in the Webb and Hernandez homicides, his motive to kill members of the Mahdi gang, and his intent to kill Webb and the Mahdis.

[72] This condition was adhered to at trial. The government did not elicit from its witnesses that anyone was killed on Roxboro Place, and that fact was not brought out on cross-examination either. Although the jury heard that one person in the Mazda was shot and wounded (by Evans, it should be noted, not Arrington), it further heard that this person was able to run from the scene and later spoke with the police. The jury had no reason to infer that his wounds were fatal.

**1. Admission of the Roxboro Place Shooting Evidence as Proof that Arrington Possessed Firearms Used in the Webb and Hernandez Murders and Other Charged Shootings**

Evidence of an uncharged crime is inadmissible for the purpose of proving the defendant's criminal disposition to commit the type of offense for which the defendant is on trial.[73]  But the evidence of the Roxboro Place shooting was not offered or admitted for such an improper purpose.[74]  It was offered and admitted for a purpose we repeatedly have held to be legitimate, namely, to prove that a defendant, Arrington, possessed weapons that recently had been used to commit the crimes with which he was charged.[75]  A defendant's possession of a weapon not long before or after it was used to commit a homicide for which he is on trial

---

[73]  *See, e.g.*, *Jenkins v. United States*, 80 A.3d 978, 998 (D.C. 2013) (citing *Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964)).

[74]  The trial court instructed the jury that it was permitted to use the Roxboro shooting evidence "only for the limited purpose of helping you decide whether a defendant had the means to commit an offense charged in the indictment," and not "to conclude that the defendant has a bad character or . . . a criminal personality." The court added that "[t]he law does not allow you to convict a defendant simply because you believe he may have done bad things not specifically charged as crimes in this case."

[75]  *See, e.g.*, *Jenkins*, 80 A.3d at 999 (upholding admission of evidence that defendant had committed an uncharged homicide with the same weapon used eight days later to commit the murder for which the defendant was on trial); *Jones v. United States*, 27 A.3d 1130, 1146 (D.C. 2011) (upholding admission in prosecution for murder of evidence that the defendant had used the murder weapon to commit an uncharged armed robbery).

"is some evidence of the probability of his guilt, and is therefore admissible."[76] Admissible evidence may be excluded, of course, if its probative value is substantially outweighed by the danger of unfair prejudice.[77] "This balancing of probative value and prejudice is committed to the discretion of the trial judge, and this court will review it only for abuse of that discretion."[78]

We cannot conclude that the trial court abused its discretion here. As the trial court noted, the Roxboro Place evidence (along with the evidence of a second uncharged shooting, to which appellants raise no objection on appeal) was "virtually [the] only evidence" that did not depend entirely on the credibility of cooperating gang members that tied Arrington to the Webb and Hernandez murders and other charged shootings. Independent witnesses and forensic DNA and ballistic analysis corroborated Evans and Smith and linked Arrington to guns used in the charged offenses. The probative value of this evidence was considerable.

---

[76] *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000) (internal quotation marks omitted).

[77] *Id.*

[78] *Id.*

Arrington argues, however, that the trial court abused its discretion by allowing the government to introduce far more evidence of his participation in the violent Roxboro shooting than was necessary or appropriate given the limited purpose for which it was admitted; in reality, he contends, "[t]he only purpose of evidence that Arrington fired at an occupied car in the Roxboro alley was to show Arrington's alleged propensity to shoot people."[79] We do not agree. It is true that other crimes evidence should omit, where possible, unnecessary details of the defendant's violence and use of a weapon; the admission of other crimes evidence for a valid purpose is not a license to go overboard and use the evidence in an improper manner.[80] This was why the trial court precluded evidence that two persons were killed in the Roxboro Place shooting, a fact both immaterial and prejudicial. But the violent details of the shooting that the court allowed the government to introduce were not superfluous.[81] They were necessary for a coherent presentation. The shell casings and bullets that police found at the scene would have meant little absent proof that Arrington fired the guns that produced

---

[79] Brief for Appellant Arrington at 53.

[80] *See Jones*, 27 A.3d at 1145.

[81] The trial court offered to restrict the government's proof if Arrington were to stipulate to his possession of the Ruger handgun and the Mac-90 assault rifle on June 3, 2000. However, Arrington refused to do so.

them.[82]  And the government hardly would have been able to persuasively establish that Arrington fired those guns without explaining the circumstances in which he did so.  A truncated account that withheld this information from the jury would have eviscerated the legitimate probative value of the Roxboro Place evidence.

The evidence of Arrington's wanton violence against the occupants of the Mazda was undeniably prejudicial as well as probative.  "[B]ut *unfair* prejudice is minimized where the evidence is admitted for a valid purpose and has substantial probative value, the prosecution does not present or argue it improperly, and the court correctly instructs the jury on the permissible use it may make of the evidence."[83]  Those conditions were satisfied here:  The probative value of the Roxboro Place evidence was substantial; we do not agree with Arrington that the prosecution "exploited the evidence to prejudice the jury against him;"[84] and the court properly instructed the jury on the limited use it could make of the evidence.

---

[82]  *Cf. Jones*, 27 A.3d at 1144 (noting lower court's recognition that evidence of defendant's possession of murder weapon in an uncharged robbery would have "little meaning" if the government were precluded from establishing that the weapon was fired in the robbery).

[83]  *Jenkins*, 80 A.3d at 999.

[84]  *Id.*

On this record, we do not find undue prejudice or an abuse of the trial court's discretion.

### 2. The Restriction of Hagans's Cross-Examination and the Denial of His Severance Motion

The decision to keep from the jury the fact that the Roxboro Place assault resulted in two deaths was for Arrington's benefit. Hagans claimed that it prejudiced him, however, by restricting his cross-examination of Evans and other government witnesses for bias. Specifically, he argued, the court's ruling prevented him from impeaching Evans with the fact that by cooperating with the prosecution, he escaped being charged with two murders (instead of the single count of assault with intent to kill while armed to which he had pleaded guilty). In addition, Hagans argued, the ruling affected his cross-examination of Smith and Payne regarding testimony they gave in other proceedings falsely implicating him in the murders at Roxboro Place. Hagans moved the court to sever his trial from that of Arrington so that he could pursue his desired cross-examination without hindrance. The trial court, weighing the advantages of a joint trial against what it considered to be the minimal impact of its ruling on Hagans's ability to cross-examine the government's witnesses, denied his request.

We conclude that the trial court did not err, either in placing limitations on Hagans's cross-examinations or in denying his request for severance. Hagans had the right, guaranteed by the Sixth Amendment, to an opportunity for effective cross-examination of the witnesses against him for bias. However, this does not mean "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[85] The court has discretion to impose reasonable limits on bias cross-examination, so long as it does not preclude a "meaningful" degree of cross-examination that allows the defense to pursue the proposed line of cross-examination in sufficient depth to elicit the "nature and extent" of the witness's bias.[86] The limitation at issue here did not prevent Hagans from "meaningfully" cross-examining Evans, Smith, and Payne. All three witnesses were heavily

---

[85] *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

[86] *Longus v. United States*, 52 A.3d 836, 850-51 (D.C. 2012). As the court elaborated in that case,

> In determining what is "meaningful" cross-examination, we have been solicitous of a defendant's right to effectively expose a witness's various biases to the jury. Thus, we have said, "[t]o make cross-examination based upon witness bias effective (and thus satisfy the Sixth Amendment), defense counsel must be 'permitted to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" A trial court ruling therefore infringes on the Sixth Amendment right to confrontation when it

*(continued…)*

impeached with their plea deals, and Hagans was able to confront them with their prior inconsistent statements, including Evans's past denials of involvement in the Roxboro shooting and Payne's alleged efforts to protect Evans by falsely implicating Hagans in the incident. We recognize that the assault with intent to kill charge to which Evans pleaded guilty was much less serious than the initial murder charges and carried with it the possibility of significantly less jail time. However, even without revealing the possible murder charges against Evans, Hagans obtained his acknowledgement that his favorable plea deal saved him from having to serve "more time than [he] could ever[] [have] lived to serve." Eliciting the fact that two people were killed in the Roxboro Place assault would have added little if any value to Hagans's cross-examinations in our view. We conclude that his Sixth Amendment right of confrontation was not infringed.

We review the trial court's denial of Hagans's severance motion for abuse of discretion, which requires Hagans to show "not only prejudice, but manifest

---

*(continued…)*

> precludes the defense from pursuing a line of examination that is necessary to enable the jury to fully evaluate the witness's credibility. It is not enough that the possibility of bias be mentioned; counsel must be permitted to present the nature and extent of the bias.

*Id.* (internal citations omitted).

prejudice" to his defense from the joinder of his trial with that of Arrington.[87] As our discussion of his constitutional claim makes clear, he has not made that showing. In light of the "long-standing presumption that defendants jointly charged with a criminal offense should be tried together," it was well within the trial court's discretion to impose the modest restriction it did on Hagans's elicitation of evidence prejudicial to Arrington rather than grant Hagans a separate trial.[88]

### D. Contingent Ruling on the Admissibility of Smith's Prior Consistent Grand Jury Testimony

In his direct examination, Jason Smith testified that he was taking Haldol, Cogentin, and Risperdal, but only, he stated, to help him sleep. On cross-examination by Hagans's counsel, Smith denied having been prescribed the medications because he had reported "hearing voices" or "see[ing] things that are not there." To impeach Smith, Hagans proposed to call Dr. Benjamin Adewale, the chief psychiatrist at the D.C. Jail, to testify that he had prescribed the

---

[87] *Mercer v. United States*, 724 A.2d 1176, 1193 (D.C. 1999).

[88] *Cf. Boone v. United States*, 769 A.2d 811, 817-18 (D.C. 2001) (upholding denial of severance where the trial court limited a defendant's cross-examination of a witness about his plea deal in a previous case, so as to avoid disclosing that one of the persons the witness had agreed to testify against in that case was also the defendant's co-defendant in the current case).

medications because Smith had been having auditory hallucinations and manifesting other psychotic symptoms. It was Dr. Adewale's opinion, though he could not be certain, that these symptoms were triggered by sexual abuse Smith had suffered while he was at the Jail.[89]

Hagans sought to present Dr. Adewale's testimony not only to show that Smith had told a lie on the witness stand in claiming his medications were just a sleep aid, but also to establish that the medications were prescribed because Smith suffered from hallucinations. As the trial court recognized, the main thrust of the latter impeachment would be not merely to prove that Smith had lied on the witness stand; rather, it would be to suggest that Smith's testimony at trial was the product of, or influenced by, his hallucinations and therefore not worth crediting. The government argued that Smith's prior consistent grand jury testimony (given before he was incarcerated and hence before he was sexually assaulted) should be admissible to counter such a suggestion. The trial court agreed, concluding that

---

[89] The mental health counselors who evaluated Smith when he was admitted to the Jail did not note any signs of mental illness in his intake records, and Smith had no known history of psychosis before he was sexually assaulted there.

this would "fairly put[] the hallucination issue before the jury and prevent[] it from taking on more value than its worth."[90]

Given the court's ruling, the defense decided not to present testimony that Smith suffered from hallucinations. In lieu of calling Dr. Adewale as a witness, the parties agreed to a stipulation, which Hagans's counsel read to the jury, that "the psychiatrist who treated Jason Smith at the D.C. Jail would testify that the medications Haldol, Cogentin and Risperdal were prescribed for Jason Smith to treat his mental health condition and not to assist him as a sleep aid."

In this court, appellant Leaks (joined by the other appellants) argues that the trial court erred in ruling that Smith's prior consistent statements would be admissible to rehabilitate him if the defense presented evidence that he had hallucinations. Appellants further argue that the court violated their Sixth Amendment confrontation rights by restricting their ability to impeach Smith with such evidence. Because appellants did not invoke the Confrontation Clause in the

---

[90] The court emphasized that Hagans had an "absolute right" to put Smith's hallucinations before the jury. It was cognizant of this court's decision in *Brown v. United States*, 766 A.2d 530, 538-39 (D.C. 2001), holding that a witness's credibility may be impeached by evidence the witness has a mental disorder with symptoms including visual and auditory hallucinations.

trial court and opted not to present Dr. Adewale's testimony about Smith's hallucinations, it is arguable that they forfeited these claims.[91] The government does not urge us to decide that issue, however, and we need not do so, because we are satisfied that the court did not err as claimed.

A trial court has "broad discretion" to permit a party to introduce a witness's prior consistent statement to rebut a suggestion that the witness's testimony at trial is a recent fabrication, provided the court finds the prior statement was made when the asserted or implied motive or other reason for the alleged fabrication did not exist.[92] Typically, this means the prior statement must have been made *before* the claimed motive or influence arose.[93]

_____

[91] *See Marquez v. United States*, 903 A.2d 815, 817 (D.C. 2006) ("Because counsel objected at trial to the admission of the statement on purely evidentiary grounds and did not raise a Confrontation Clause objection, we must review the claim for plain error.") (footnote omitted); *Butler v. United States*, 688 A.2d 381, 386-88 (D.C. 1996) (holding that the defendant failed to preserve his challenge to an *in limine* ruling that impeachment of the arresting officers for bias would open the door to evidence of the defendant's prior arrests, where the defendant chose to forego the bias impeachment and the trial court was never called upon to decide precisely what evidence the government would be allowed to present in rebuttal); *see also Brisbon v. United States*, 894 A.2d 1121, 1130-31 (D.C. 2006).

[92] *Rowland v. United States*, 840 A.2d 664, 679 (D.C. 2004); *see also, e.g.*, *Mason v. United States*, 53 A.3d 1084, 1090-92 (D.C. 2012). D.C. Code § 14-102 (b) (2013 Repl.) provides that prior consistent statements are "not hearsay," and are admissible as "substantive evidence," when properly offered "to rebut an express or implied charge against the witness of recent fabrication or improper

*(continued…)*

The trial court properly applied these principles in connection with Hagans's proffered evidence that Smith was taking antipsychotic drugs to suppress his hallucinations. The court reasonably could find, as it did, that the evidence Smith had suffered from hallucinations would suggest to the jury that his testimony against appellants contained hallucinatory fabrications. Based on Dr. Adewale's expert opinion and Smith's available mental health records, the court reasonably could find as well that Smith's hallucinations were probably caused by his sexual assault at the D.C. Jail, which occurred sometime after Smith testified before the grand jury.[94] A more-likely-than-not finding was sufficient for these purposes, as preponderance of the evidence is the "standard . . . traditionally used in deciding

_____

*(continued…)*
influence or motive." This statutory provision is substantively identical with Federal Rule of Evidence 801 (d)(1)(B).

[93] That temporal priority is a requirement under the Federal Rules of Evidence. *See Tome v. United States*, 513 U.S. 150, 167 (1995) (holding that Federal Rule of Evidence 801 (d)(1)(B) "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive"). However, we have held that "there is no such per se rule in this jurisdiction." *Reed v. United States*, 452 A.2d 1173, 1181 n.8 (D.C. 1982).

[94] *See Mason*, 53 A.3d at 1090 n.4 ("Though the common phrase is 'recent' fabrication or contrivance, the term 'recent' is misleading. It is not required to be near in point of time to the trial, but only that the alleged contrivance be closer to the trial in point of time than the consistent statement.") (quoting MCCORMICK, EVIDENCE § 47, at 228 n.36 (6th ed. 2006)).

preliminary fact questions" relating to the admissibility of "virtually all" evidence."[95] The court therefore could find Smith's prior consistent grand jury testimony to be admissible to rebut the suggestion that Smith's in-court testimony was the product of his hallucinations.

Taking issue with this conclusion, appellants primarily argue that Smith's prior consistent statements were inadmissible because Dr. Adewale's testimony suggested only that Smith was delusional, not that he was "deliberately lying."[96] But we have never held that the use of prior consistent statements to rehabilitate a witness is limited to charges of deliberate lying, and appellants do not provide us with a sound rationale for adopting such a limitation. Historically, we think, the rule has been more broadly understood; McCormick on Evidence states:

> [A]t common law under the prevailing temporal priority doctrine, if the attacker has charged bias, interest, corrupt influence, contrivance to falsify, or want of capacity to observe or remember, the prior consistent statement is deemed irrelevant to refute the charge unless the consistent statement was made *before* the source of the bias, interest, influence or incapacity originated. If the

---

[95] *Devonshire v. United States*, 691 A.2d 165, 169 (D.C. 1997).

[96] Brief for Appellant Leaks at 39 (asserting that the rule permitting the introduction of prior consistent statements "relates only to charges of recent *fabrication*—that is, to charges that a witness is deliberately lying").

statement was made later, proof of the statement does not assist the jury to evaluate the witness's testimony because the reliability of the consistent statement is subject to the same doubt as the trial testimony.[97]

In other words, under the "prevailing doctrine," an attack based on the witness's impaired mental condition at the time of trial may be answered with proof that the witness made consistent statements before the impairment developed.[98] This proposition makes sense, and we see no reason to reject it.

---

[97] Kenneth S. Broun *et al.*, 1 MCCORMICK ON EVIDENCE § 47, at 314 (7th ed. 2013); *see also Tome*, 513 U.S. at 156 ("The applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated.") (quoting E. Cleary, MCCORMICK ON EVIDENCE § 49, at 105 (2d ed. 1972)); R. Park & T. Lininger, THE NEW WIGMORE, A TREATISE ON EVIDENCE: IMPEACHMENT AND REHABILITATION § 9.4, at 344 (2012 ed.) (stating that *Tome* "should not be read to categorically prohibit the use of consistent statements in . . . cases where the asserted basis for inaccuracy is 'incapacity,'" even though the concept of the declarant's incapacity is not specifically mentioned in Federal Rule of Evidence 801 (d)(1)(B)).

[98] Admittedly, it is rare for a witness's prior consistent statements to be offered to rebut impeachment based on the witness's impaired mental condition. But it happened at the trial in *Lowery v. Commonwealth*, 566 S.W.2d 750 (Ky. 1978). In that case the Supreme Court of Kentucky held that a prior consistent statement could be used to rehabilitate a prosecution witness who was impeached with the fact that he had been drinking shortly before he took the stand and had been "locked up for being drunk." The court reasoned:

> Evidence of the present lack of sobriety of a witness is doubtless admissible. It tends to discredit his testimony because it involves a diminution of his trustworthiness in respect to his present ability to recollect and

*(continued…)*

Thus, we hold that there was no abuse of discretion in the trial court's evidentiary ruling. Furthermore, that ruling did not infringe appellants' Sixth Amendment rights to cross-examine the government's witnesses and present evidence impeaching them. The ruling at issue did not curtail those rights in any way; it did not limit appellants' cross-examination of Smith, nor did it prevent them from calling Dr. Adewale to complete Smith's impeachment. Allowing the government to introduce admissible evidence in rebuttal was not an infringement of appellants' Sixth Amendment rights, even if it dissuaded appellants from exercising them.

**E. Prosecutorial Argument Regarding Payne's Grand Jury Testimony**

Appellants contend that the government, with the trial court's sanction, improperly bolstered Payne's credibility by referring to grand jury testimony that

---

*(continued…)*

> communicate . . . . Once the present ability of the witness to recollect and communicate is discredited, consistent statements made before the onset of the malady become relevant and probative. They tend to support the accuracy of the testimony by showing that the story was the same before the fogging of the memory and the thickening of the tongue.

*Id.* (internal citations omitted). We think this reasoning is sound.

was not in evidence. For the reasons that follow, we conclude that appellants are not entitled to relief on this ground.

From Payne's direct examination at trial, the jury learned that he had appeared before the grand jury on two days, September 13 and 15, 2000, to testify about the shooting of Eva Hernandez as well as the encounter with Nadir Madhi earlier that day that might have instigated the shooting. The government did not elicit any further details of that testimony. During Payne's cross-examination, however, the jury learned that his trial testimony arguably diverged from his grand jury testimony on four specific points: the color of the stolen Honda Accord that Payne drove to and from Fourteenth Street on May 17, 2000; how he and Leaks cleaned the car; the particular weapon Hagans fired during the incident; and whether Evans was at the D.C. Jail or in a half-way house on May 17. No other purported inconsistencies between Payne's grand jury and trial testimony were identified. On redirect, Payne confirmed his grand jury testimony as to which car he was driving notwithstanding his mistake in the grand jury about its color. The jury heard nothing further about the content of the testimony.[99]

---

[99] The jury did learn, though, that Payne had no deal with the government when he appeared before the grand jury, and that he did not enter into his cooperation plea agreement until December 2001.

The government subsequently moved to introduce forty-five pages of Payne's grand jury transcripts in evidence to rebut what it viewed as an implied charge by Hagans's counsel of recent fabrication, namely that the government had "bought and paid for" Payne's testimony with the financial benefits he gained from having been placed in the Witness Protection Program.[100] Although the trial court agreed that the suggestion of recent fabrication had been made, it denied the government's request. The court indicated, however, that further emphasis by the defense on the monetary benefits Payne received might open the door to rebuttal argument based on Payne's prior consistent grand jury testimony. Later, after certain defense counsel sought to discredit Payne in their closing arguments by citing how much the government had paid on his behalf when he was in the Witness Protection Program, the government moved to reopen the evidence to introduce his grand jury testimony. The trial court declined to reopen the evidence but ruled there was "certainly a record" enabling the government to argue that Payne identified who was involved in the May 17 raid in which Hernandez was killed "before anyone got a cent or there was any protection."

---

[100] Payne requested witness protection after he testified in the grand jury. Eventually, he and Tamika Payne entered the Witness Protection Program and were relocated. While they were in the Program, the government disbursed approximately $81,000 to cover their living expenses.

In the government's closing and rebuttal arguments, the prosecutor referred to Payne's grand jury testimony primarily to make three points: (1) that Payne's account of the events surrounding the murder of Hernandez had been corroborated by a great deal of independent evidence; (2) that Payne's testimony at trial had not been impeached; and (3) that his testimony had not been influenced by the benefits he had received from the Witness Protection Program and his cooperation plea agreement.

As to the first point, the prosecutor argued that when Payne appeared in the grand jury, he had no "control" over the other facts that would come to light "that tell you that what he's saying is the truth"—he could not have known that Nadir Mahdi would plead guilty two years later, that other witnesses would emerge and confirm his testimony, or that the police would acquire forensic and other corroborative evidence. Hagans's counsel objected to this line of argument on the ground that the government was "arguing prior consistent statements that are not in evidence . . . . This whole argument is what [Payne] told the grand jury is the same as what he is telling you here today." The court overruled this objection, stating that the government's argument "meets the force of the impeachment that will be argued and that has been suggested."

As to the second point, the prosecutor argued that

> Charles Payne when he first testified, I submit to you, didn't talk about a single significant fact that wasn't true. His appearances over those two days at one time did he lie about anything significant that mattered[?] Such as who was responsible, how did the shootings occur, where did they happen, when, who was involved?

There was no objection to this argument.

Lastly, as to the third point, in rebuttal the prosecutor argued that Payne's witness protection payments and plea agreement "could not have influenced" his trial testimony, as had been suggested by the defense in closing, because Payne gave the same testimony to the grand jury long before either motive to fabricate arose. There was no objection to this argument either.

In reviewing a challenge to prosecutorial argument, we consider whether the prosecutor's statements were in fact improper, and if they were, whether the defendant suffered "substantial prejudice."[101] Appellants claim that the prosecutors' references to Payne's grand jury testimony were improper because that testimony had not been admitted in evidence (the trial court having denied the

---

[101] *Fearwell v. United States*, 886 A.2d 95, 102 (D.C. 2005).

government's requests to introduce some forty-five pages of grand jury transcript). We do not agree. "[I]t is improper for an attorney to make an argument to the jury based on facts not in evidence or not reasonably inferable from the evidence."[102] But even without having Payne's grand jury transcript to read, the jury heard that Payne testified for two days in the grand jury about the shooting of Eva Hernandez and the earlier encounter with Nadir Mahdi; it heard the defendants impeach Payne's trial testimony regarding those events with only a few minor inconsistencies in his grand jury testimony; and it heard the government rehabilitate Payne with other portions of that testimony. From all that it heard, the jury surely could infer quite reasonably and permissibly that Payne's testimony before the grand jury was consistent in all material respects with his testimony at trial. Defense counsel undoubtedly would have cross-examined Payne about any material deviation, had there been any.

Thus, the question before us is not whether the prosecutors argued facts outside the evidence, but whether they made a legally improper argument. On that score, appellants contend the prosecutors used Payne's grand jury testimony improperly to bolster the credibility of his testimony at trial.

---

[102] *Id.* at 101 (internal quotation marks and brackets omitted).

The general rule is that "[p]rior consistent statements may not be used to bolster an unimpeached witness;" the rationale being that "mere repetition does not imply veracity."[103] And impeachment with a prior inconsistent statement does not automatically render it permissible to introduce and argue prior consistent statements to rehabilitate the witness, for generally speaking, "evidence of additional consistent statements does not remove the inconsistencies."[104] As we already have seen, though, the general rule has its exceptions; among them, that prior consistent statements may be used to rehabilitate a witness when (1) there is an express or implied charge of recent fabrication, or (2) the witness has been impeached with a portion of a statement and the rest of the statement "contains relevant information that could be used to meet the force of the impeachment" (a rule-of-completeness concept).[105]

Two of the prosecutors' references to Payne's grand jury testimony, to which no contemporaneous objection was even made, fit comfortably within one

---

[103] *Daye v. United States*, 733 A.2d 321, 325 (D.C. 1999) (quoting *Reed v. United States*, 452 A.2d 1173, 1179 (D.C. 1982), and *Warren v. United States*, 436 A.2d 821, 836 (D.C. 1981)).

[104] *Id.* (quoting *Warren*, 436 A.2d at 836).

[105] *Reed*, 452 A.2d at 1180.

or the other of these exceptions. First, to rebut Payne's impeachment with a few inconsistencies on minor points culled from his grand jury testimony, it was permissible on this record for the prosecutor to argue (pursuant to the "rule of completeness" exception) that Payne did not testify falsely or inconsistently in the grand jury "about anything significant."[106] As we have said, this was a fact fairly inferable from the evidence. Second, to refute the suggestion that Payne lied about appellants to get the monetary benefits of being in the Witness Protection Program, it was permissible (under the "recent fabrication" exception) for the prosecutor to respond that Payne incriminated appellants in his grand jury testimony months "before one dime was ever spent on his behalf."[107] The prosecutor's additional assertion that Payne's grand jury testimony could not have been influenced by his plea agreement fifteen months later is perhaps more debatable, inasmuch as Payne concededly was hoping to reduce his sentencing exposure and "salvage something"

---

[106] Appellants assert that the prosecutor improperly vouched for the truth and content of Payne's grand jury testimony when he "submit[ted]" to the jury that Payne "didn't talk about a single significant fact that wasn't true." We disagree; in context, this was argument, based on the evidence, that Payne had not been impeached, not an expression of the prosecutor's personal opinion of Payne's credibility.

[107] This is so even though Payne may have had other motives to lie to the grand jury. *See Mason v. United States*, 53 A.3d 1084, 1091-93 (D.C. 2012) (holding that "a prior consistent statement, made when a witness had a motive to lie, may be admitted to rebut a charge of fabrication alleged to have been motivated by a more recent, and different, motive").

even when he appeared before the grand jury.[108] But the jury was well aware of Payne's motives when he testified in the grand jury, and the prosecutor did not dispute them. We cannot say that the prosecutor's limited point about Payne's plea agreement was improper.[109]

That brings us to the government's assertions that Payne could not have foreseen all the corroboration there would be following his grand jury appearance. To the extent these assertions served to enhance the credibility of Payne's grand jury testimony, they were in tension with the general rule against using prior consistent statements to bolster a witness's in-court testimony. On the other hand, the trial court, in overruling the defense objection, deemed this argument to be a permissible rejoinder to the previously implied and anticipated impeachment of Payne—by which we presume the court meant the suggestions that the government had "bought and paid" for Payne's testimony through the Witness Protection

---

[108] *Cf. Daye*, 733 A.2d at 327 ("This court . . . has rejected the argument that impeachment with the fact of immunity provides the basis for admitting prior consistent statements of a witness accused of having a bias to shift blame to others from the beginning.").

[109] *Cf. Mason*, 53 A.3d at 1093 ("Where the jury has been exposed to the witness's motive to fabricate both before and after the prior consistent statement was made, the better rule is to allow counsel to argue their inferences to the jury and let jurors weigh the evidence.").

Program. And as we have noted, by the time the prosecutor stood up to make the government's rebuttal argument, the trial court had ruled explicitly that the government could use Payne's grand jury testimony to rebut the implied charge of recent fabrication. Since a prior consistent statement is substantive evidence when used for that purpose,[110] it would seem that it was ultimately permissible for the government to argue the credibility of Payne's grand jury testimony.

More important, the prosecutors did not contend that Payne's prior consistent testimony reinforced his credibility under the flawed logic that "repetition implies veracity," nor did they explicitly urge the jury to rely on the truth of what Payne said in the grand jury as distinct from his testimony at trial. Rather, the government's main point was simply that Payne was corroborated by powerful, independent evidence. This certainly was a valid and permissible point to make; and the prosecutors emphasized it in both the initial closing argument and the rebuttal argument, usually without referring to Payne's grand jury testimony at all. The references to that testimony were tangential to their theme and were only a small part of the argument made on behalf of Payne's credibility.

---

[110] D.C. Code § 14-102 (b).

Thus, we consider it by no means clear that the prosecutors improperly bolstered Payne with his grand jury testimony, as appellants contend. We are satisfied that the prosecutors committed no serious impropriety, if there was any at all. Moreover, we readily conclude that appellants suffered no substantial prejudice as a result of any inappropriate bolstering that may have occurred.[111] As we have observed in the past, "only in a case where the government's proof of guilt was 'marginal' have we thought the prejudice from this impermissible bolstering enough to warrant reversal without more."[112] This was not such a case. The proof of each appellant's guilt was relatively strong, as the government backed up the testimony of Payne and several other cooperating witnesses with testimony from a host of corroborating expert and lay witnesses.[113] We are confident that the

---

[111] The applicable test is "whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[.]'" *Washington v. United States*, 884 A.2d 1080, 1088 (D.C. 2005) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

[112] *Daye*, 733 A.2d at 327; *accord Porter v. United States*, 826 A.2d 398, 410 (D.C. 2003).

[113] So, for example, appellant Allen (who has taken the lead on appeal in making the claim of improper bolstering) argues *inter alia* that the case against him was weak and depended on Payne, "whose motives were suspect," and that without his grand jury testimony to reinforce his credibility, the jury "could have wondered if Payne fabricated details of his testimony in cooperation with the government."
*(continued…)*

references to Payne's grand jury testimony in the prosecutors' arguments made no difference to the outcome.

**F. Denial of Separate Trials for Appellants Allen and Leaks**

Both Allen and Leaks claim the trial court abused its discretion in denying their motions for separate trials. They assert severance was required pursuant to Criminal Rule 14[114] because the disparate charges and weight of the evidence against their co-defendants Arrington and Hagans "created a high risk of prejudicial spillover and invited the jury to convict [them] on a guilt-by-association theory."[115] Specifically, Allen and Leaks complain, while they were charged with

_(continued…)_
Brief of Appellant Allen at 35. This is unpersuasive. While Payne unquestionably was a key prosecution witness, there was no evidence he fabricated details of his testimony; rather, his testimony at trial was amply corroborated, and he was one of several witnesses who testified that Allen (along with the other defendants) was a Delafield gang member who actively took part in the May 17 shooting. Jason Smith, himself a participant in that shooting, testified to Allen's involvement in it; Sean Gardner reported watching Allen and the others prepare immediately before the shooting and dispose of the evidence afterward; and Marquet McCoy testified that both Allen and Leaks remorsefully told him of their participation in the shooting.

[114] Super. Ct. Crim. R. 14.

[115] Brief of Appellant Leaks at 41; _see also_ Brief of Appellant Allen at 43 (contending that the "disparate charges and evidence" against Allen and his co-defendants necessitated that he be tried separately).

a single incident (the May 17, 2000, raid resulting in the murder of Hernandez and wounding of Flores-Bonilla), the jury in their joint trial with Arrington and Hagans heard a great deal of prejudicial testimony about numerous other violent crimes, charged and uncharged, in which they were not involved. Allen further argues that even with regard to the May 17 shooting, the disproportionately greater evidence against his co-defendants was prejudicial to him and might have been excluded had he been tried separately.[116]

Under Criminal Rule 14, a trial court may grant severance if it appears that a defendant will be prejudiced by joinder, but "[t]his discretionary authority is to be exercised with caution;" in view of the strong policy reasons and longstanding presumption in favor of joint trials, a court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment

---

[116] Leaks presents the additional argument that the joinder for trial of Arrington's indictments for the Tabron and Nelson shootings with the original indictment was improper under Superior Court Criminal Rule 8 (b). On its merits, we think this claim of misjoinder to be doubtful at best, but we need not decide it. The Rule 8 (b) objection was not made below; the argument is made for the first time on appeal. Even assuming Leaks has not waived the objection, he has not made the demonstration of plain error that might justify relief on this ground. *See Taylor v. United States*, 603 A.2d 451, 455 (D.C. 1992); *see also Howerton v. United States*, 964 A.2d 1282, 1290 (D.C. 2009).

about guilt or innocence."[117] We will reverse a trial court's denial of a motion for severance "only upon a clear showing that it has abused its considerable discretion."[118] To demonstrate such an abuse, an appellant must show "manifest prejudice."[119]

Allen and Leaks have not made that showing. In the first place, that they were not accused of having participated in any violent incidents besides the May 17 shooting does not mean substantial evidence of those other incidents would have been excluded had they been tried separately. In addition to the shooting, they were charged with having joined a conspiracy to assault and kill members, associates, and friends of the Mahdi brothers' organization. "In a conspiracy case, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged."[120] Even if Allen and Leaks had been tried separately,

---

[117] *Moore v. United States*, 927 A.2d 1040, 1056 (D.C. 2007) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

[118] *Coleman v. United States*, 948 A.2d 534, 544 (D.C. 2008) (internal quotation marks omitted).

[119] *Id.* at 544-45 (internal quotation marks omitted).

[120] *Castillo-Campos*, 987 A.2d 476, 493 (D.C. 2010) (internal quotation marks omitted) (holding that appellant was properly joined in a conspiracy trial,
*(continued…)*

considerable evidence of the charged substantive offenses in which they did not participate would have been relevant and admissible to establish the existence of the conspiracy. The evidence also would have been admissible to establish the motive for the May 17 shootings. In addition, evidence of the Roxboro Place shooting could have been admissible in separate trials of Allen and Leaks to prove their alleged accomplice Arrington's possession of the weapons used in the May 17 raid. Allen and Leaks argue that had they been tried separately, the trial court likely would have excluded some of this evidence of their co-conspirators' violent actions as substantially more prejudicial than probative. But we have no reason to doubt that much of the evidence still would have been introduced, permissibly, for the legitimate purposes mentioned.[121]

_____

*(continued…)*
even though fifty-three of the charged overt acts occurred before the first overt act with which he was charged).

[121] We think it clear, moreover, that the proof of Arrington's and Hagans's commission of the May 17 shootings would have been relevant and admissible in separate trials of Allen and Leaks. Allen argues that his co-defendants' self-incriminating statements to other Delafield gang members would have been excluded in a separate trial as hearsay or as being prejudicially inflammatory. But at least some of the alleged statements likely were admissible against Allen under the penal interest exception to the rule against hearsay, and since those statements did not mention Allen, we are confident they were not unfairly prejudicial to him.

Even if that were not so, and Allen and Leaks might have had a better chance of being acquitted had they been tried separately, that would not suffice to demonstrate error in the denial of severance.[122] In general, "[a] defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than the evidence against him."[123] It is true that "in some cases, 'where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants,'" we have recognized the possibility of a "spillover effect" that might be so prejudicial as to call for severance.[124] But the evidence that Allen and Leaks entered the charged conspiracy and participated in the May 17 shootings was far from *de minimis*, given that Payne and Smith described on the witness stand how the two defendants joined with them in the venture from start to finish; Gardner described seeing them prepare for the attack and dispose of incriminating evidence afterwards; and

---

[122] *See Roy v. United States*, 871 A.2d 498, 504 (D.C. 2005).

[123] *Hargraves v. United States*, 62 A.3d 107, 116 (D.C. 2013) (quoting *Christian v. United States*, 394 A.2d 1, 21 (D.C. 1978)).

[124] *Id.* (quoting *Christian*, 394 A.2d at 21); *see also, e.g.*, *Catlett v. United States*, 545 A.2d 1202, 1209 (D.C. 1988) ("Disparity of the evidence may pose a risk of prejudice requiring reversal, but only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants.") (internal quotation marks omitted).

McCoy testified that Allen and Leaks each regretfully acknowledged their involvement to him.

Ultimately, the issue of "spillover" prejudice turns on "whether the evidence presented was so complex or confusing that the jury would have been unable to make individual determinations about the guilt or innocence of each defendant."[125] We conclude this was not such a case. The non-involvement of Allen and Leaks in any substantive crimes other than the May 17 shootings was clear; there is "no indication that the evidence was too unwieldy for the jury to keep straight or that jurors were unable to make individual determinations about each appellant's guilt or innocence as to the substantive offenses with which each was charged."[126] To minimize the danger of jury confusion, the government presented its evidence, as it did in *Castillo-Campos*, "incident by incident, having witnesses return to the stand multiple times to offer their testimony as to particular incidents and their participants, rather than having each witness testify at one sitting to all incidents of which he had knowledge."[127] The trial court instructed the jury to consider the

---

[125] *Hargraves*, 62 A.3d at 117 (internal quotation marks, brackets and ellipses omitted).

[126] *Castillo-Campos*, 987 A.2d at 493.

[127] *Id.*

uncharged-crime evidence only in determining whether Arrington had the means to commit the charged offenses.[128] The court also instructed the jury that "[e]ach defendant is entitled to have his guilt or innocence as to each of the crimes charged to him determined from his own conduct and from the evidence which applies to him as if he were being tried alone;" and that "[t]he guilt or innocence of any one defendant of any of the crimes charged should not control or influence your verdicts as to any other defendant." In view of all these factors, we are confident "[t]he jury clearly did not find [Allen or Leaks] guilty of anything based on the evidence of his co-defendants' greater culpability."[129] The trial court did not abuse its discretion in denying their severance motions.

### G. Sufficiency of the Evidence against Allen and Leaks

Leaks and Allen contend the government presented insufficient evidence that they had a specific intent to kill to support their convictions for the armed first-

---

[128] As previously mentioned, to reduce the potential for unfair prejudice, the court also excluded evidence that anyone was killed in the Roxboro incident.

[129] *Hargraves*, 62 A.3d at 117.

degree murder of Hernandez[130] and the AWIKWA of Flores-Bonilla.[131] Arrington's declaration that they were "going to go back down there and light them [the Mahdis] up" was, Leaks argues, "ambiguous at best" and only indicated a plan to shoot up the Mahdis' neighborhood, not a specific plan to kill anyone. Moreover, Leaks asserts, "[t]here was no evidence that any persons were in view, or that any of the Delafield members specifically shot at any person," during the attack on May 17, 2000; rather, he says, "the evidence was that they shot at a *house*," and while "they could reasonably have believed [the house] to have been occupied," that would not be enough to show the requisite specific intent to kill.[132] Allen, who adopts Leaks's arguments, asserts in addition that there was no evidence he actually fired a weapon that evening (as there was with respect to each of the other appellants).

---

[130] "First-degree premeditated murder is murder committed with the specific intent to kill after premeditation and deliberation." *Kitt v. United States*, 904 A.2d 348, 353 (D.C. 2006).

[131] "To prove the AWIKWA charges . . . the government had to show beyond a reasonable doubt that [appellants]: (1) made an assault on the [complainant]; and (2) did so with specific intent to kill; (3) while armed." *Nixon v. United States*, 730 A.2d 145, 148 (D.C. 1999).

[132] Brief of Appellant Leaks at 49.

When reviewing a sufficiency challenge, "[w]e view the evidence in the light most favorable to the government, recognizing the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony."[133] A "conviction will be overturned only where there has been no evidence produced from which guilt may reasonably be inferred."[134]

The evidence in this case showed that appellants, including Leaks and Allen, agreed upon and carried out a plan of retaliation for Nadir Mahdi's attempt to kill Arrington and his comrades earlier that day. They decided to go to Fourteenth Street to shoot Mahdi gang members. They armed themselves for the purpose with massive, lethal firepower, including two assault rifles. Upon arriving on the scene, they immediately unleashed an indiscriminate attack that lasted for minutes, firing a hail of bullets in the direction of the house where Nadir Mahdi had been seen.[135]

---

[133] *Dickerson v. United States*, 650 A.2d 680, 683 (D.C. 1994).

[134] *Lewis v. United States*, 767 A.2d 219, 222 (D.C. 2001).

[135] Allen's assertion that there was no evidence he fired a weapon is incorrect. Although Payne and Smith testified they did not see whether he did so, Gardner testified that Allen told him he fired the shotgun twice before it jammed, and the police found two expended shotgun shell casings in the stolen Accord in which Allen had ridden. But even if Allen did not shoot, the remaining evidence

*(continued…)*

Hernandez was in plain sight out on the street close to that house when she was gunned down in the fusillade.[136] Flores-Bonilla was inside her neighboring house when she was wounded by a bullet that came in through her window. Based on this evidence, we think the jury was entitled to find that appellants all set forth on a mission to Fourteenth Street to kill Mahdi gang members they found there, and that their intent to do so extended to the killing of Hernandez and wounding of Flores-Bonilla if only because each of those bystander victims was in the wide zone of lethal danger appellants intentionally created by their barrage of gunfire in their attempt to carry out their mission. As the trial court instructed the jury, "if a person intentionally creates a kill zone to ensure the death of his primary victim[,] you may infer, from the method used, an intent to kill others concurrent with the intent to kill the primary victim."[137] Further, the doctrine of transferred intent, on

_____

*(continued…)*
supported a finding that he shared the intent to kill Mahdi gang members when he joined in the undertaking to do so.

[136] For this reason, we reject Leaks's assertion that there was no evidence appellants saw and deliberately shot at anyone during the attack. The jury readily could have found that Hernandez was visible to appellants, and that at least one appellant deliberately fired on her.

[137] *See, e.g.*, *Freeman v. United States*, 912 A.2d 1213, 1219 (D.C. 2006) ("Even though appellant . . . merely fired in [the decedent's] direction, this court has held that causing another person to be in a 'zone of harm' is sufficient to establish a specific intent to kill."); *Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999) ("[W]here the means employed to commit the crime against a primary

*(continued…)*

which the jury also was instructed, allowed appellants to be held liable for the death of Hernandez and wounding of Flores-Bonilla even though the appellants intended to kill Madhis.[138] We conclude, therefore, that the evidence was sufficient for the jury to find that Leaks and Allen possessed the requisite intent to kill to support their convictions of first-degree murder while armed and AWIKWA.

## H. Cumulative Effect of the Errors

Appellants argue that the combined prejudicial effect of the errors in this case warrants reversal of their convictions even if no single error alone was grave enough to require such relief. We have recognized that multiple errors must be evaluated in light of their cumulative impact on the fairness of the trial.[139] Assessing whether the cumulative impact of several errors mandates reversal is not

---

*(continued…)*
victim created a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.") (quoting *Ruffin v. United States*, 642 A.2d 1288, 1298 (D.C. 1994)).

[138] *See* O'Connor v. United States., 399 A.2d 21, 24 (D.C. 1979) (noting that the doctrine of transferred intent "provides that when a defendant purposely attempts to kill one person but by mistake or accident kills another, the felonious intent of the defendant will be transferred from the intended victim to the actual, unintended victim").

[139] *See Foreman v. United States*, 792 A.2d 1043, 1058 (D.C. 2002).

conceptually difficult when the same evaluative standard applies to each error. For example, when all the errors are non-constitutional and preserved for appellate review, and the traditional *Kotteakos* standard therefore applies to each of them, we readily apply that standard to the combination of errors: We must be satisfied that the errors *en masse* did not "substantially" influence the jury's verdict in order to affirm the judgment on appeal.[140] Similarly if the errors all were unpreserved, their aggregate impact would have to amount to plain error before the court might exercise its discretion to grant relief.[141] And presumably, if the errors all are constitutional and preserved, so that the *Chapman* standard applies to each error, we would have to reverse unless we could say that even in combination they were harmless beyond a reasonable doubt.

The present case is not so simple; we have identified (or assumed *arguendo*) preserved constitutional error in the admission of the Mahdi plea proffers; preserved non-constitutional error in the introduction of Leaks's inculpatory

---

[140] *Id.* at 1058-59 (citing the test for harmless non-constitutional error set forth in *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

[141] *See Euceda v. United States*, 66 A.3d 994, 1011 (D.C. 2013) ("We review all of these claims and their cumulative effect for plain error because Mr. Euceda's trial counsel did not object in any of these matters."); *United States v. Necoechea*, 986 F.2d 1273, 1282-83 (9th Cir. 1993) ("[A]ll of the errors Necoechea raises are subject to plain error review. Therefore we review the cumulative impact of the possible plain errors for plain error.").

statements to McCoy; and (possible) unpreserved error in the admission of party-opponent statements and the joinder of indictments for trial. Each type of error is subject to a different test (*Chapman*, *Kotteakos*, plain error) for determining whether it requires reversal. This court has never addressed how to evaluate the cumulative impact of such a mixed bag of errors, and there is little pertinent authority elsewhere. The Supreme Court has yet to confront the issue. As for the federal appellate courts, it appears that only the Tenth Circuit has delved into the question. It has concluded that "[i]f any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt, in accordance with *Chapman*;"[142] and that if there are both preserved and unpreserved errors, a two-stage process of evaluation should be followed.[143] It is unclear how other appellate courts would approach the problem.[144]

---

[142] *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002) (citing *United States v. Rivera*, 900 F.2d 1462, 1470 n.6 (10th Cir. 1990) (en banc)).

[143] The Tenth Circuit has described this process as follows:

> [W]hen there are both preserved and unpreserved errors, cumulative-error analysis should proceed as follows: First, the preserved errors should be considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required. If, however, they are cumulatively harmless, the court should consider

*(continued…)*

For now, however, we need not grapple with the enigmas of the cumulative error doctrine. Our assessment of the strength of the government's case and the innocuousness (as we have discussed) of the few errors we have found or assumed

---

*(continued…)*

> whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error. In other words, the prejudice from the unpreserved error is examined in light of any preserved error that may have occurred. For example, the defendant may not be able to establish prejudice from the cumulation of all the unpreserved errors, but factoring in the preserved errors may be enough for the defendant to satisfy his burden of showing prejudice. If so, the fourth prong of plain-error review must then be examined.

*United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008).

[144] *See, e.g.*, *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009) (finding it unnecessary to decide whether to consider harmless and plain errors "together or separately"); *United States v. Baker*, 432 F.3d 1189, 1224 (11th Cir. 2005) (stating that "because the defendants did not preserve any of their constitutional evidentiary claims, we review the aggregate effect of the district court's constitutional and non-constitutional errors under the *Kotteakos* standard for each defendant"); *United States v. Fernandez*, 388 F.3d 1199, 1256-57 (9th Cir. 2004) ("To the extent that we have found that any claimed error of the district court was harmless, or that claimed error did not rise to the level of plain error, we conclude that the cumulative effect of such claimed errors is also harmless because it is more probable than not that, taken together, they did not materially affect the verdict."). The Fifth Circuit has declared that cumulative error of any kind "justifies reversal only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (citing *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)).

*arguendo* convinces us that, even in combination, and even applying a *Chapman* standard across the board, there is no reasonable possibility the errors affected the outcome of appellants' trial.[145]

### III. Conclusion

For the foregoing reasons, we affirm appellants' convictions and the judgment of the Superior Court.

*So ordered*.

---

[145] In this respect, we may echo a passage from an opinion of the First Circuit:

> The cumulative error doctrine is inapposite here.  While we have uncovered a few benign bevues . . .  the errors were not portentous; they were few and far between; they possessed no special symbiotic effect; they occurred in the course of a two-month trial; and the government's case was very strong.  Consequently, the errors, in the aggregate, do not come close to achieving the critical mass necessary to cast a shadow upon the integrity of the verdict.

> Considering the trial's length, complexity, and hard-fought nature, the [trial] court's handling of it evokes our admiration.  Appellants' focus on cumulative error does not change the picture.

*United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993).